OPINION
SMITH, TRACY M., Judge
In this family-law case, appellant husband challenges the district court’s order declaring invalid the antenuptial agreement he executed with respondent wife. Husband also challenges the district court’s subsequent order awarding wife (1) $750,000 as her share of marital property, (2) temporary rehabilitative and permanent spousal maintenance, and (3) need-based attorney fees. We conclude that the district court did not err in determining that the antenuptial agreement is invalid and did not abuse its discretion in awarding marital property, temporary rehabilitative spousal maintenance, and attorney fees to wife. However, we conclude that the district court abused its discretion in its award of permanent spousal maintenance. We therefore affirm in part, reverse in part, and remand.
FACTS
Appellant Robbie Kremer and respondent Michelle Kremer began living together in 1997 and, in August 2000, agreed to get married. While they were living together before their marriage, husband informed wife that he would not marry her without an antenuptial agreement, but they did not discuss any terms. When they agreed to marry, husband was the owner of a farming operation with equity of $643,756. Wife worked at a gas station and later on husband’s farm. This was husband’s first marriage, and wife was previously married and divorced. When the parties married, wife had children.
The parties planned a March 6, 2001 destination wedding in the Cayman Is *45 lands, together with family and Mends. The parties planned to travel from their home in Nobles County to the Twin Cities on March 1, in anticipation of their March 2 flights. Beginning in late January or February, unbeknownst to wife, husband began meeting with his lawyer to draft an antenuptial agreement. Husband had a minimum of six contacts with his attorney to create the document. On February 26, husband met with his attorney and signed the agreement; sometime later that day, husband gave the signed agreement to wife and told her to talk to an attorney. Husband made clear that there would be no wedding if she did not sign the agreement. By this time, family and friends had paid for their lodging and airfare to the Cayman Islands, and some of them had started their travels.
Wife attempted but failed to secure an appointment with her attorney from her previous divorce, but she was able to consult with a different attorney on February 28. The attorney reviewed the agreement with wife, and wife signed the agreement at that meeting and returned it to husband the same day. The agreement foreclosed any claims to spousal maintenance and provided that marital property would be divided “in proportion to the actual monetary consideration provided by each [party].”
The next day, the parties traveled to the Cayman Islands, and they were married on March 6. After the wedding, wife worked less on the farm than she had prior to getting married. After the parties’ child was born in 2008, wife’s time spent working on the farm further decreased, but she still contributed to the farm operation. Wife’s contributions to the farm included driving the combine, bringing seed out to the field, making meals for farm workers, and mowing the lawn. Wife also maintained the house, purchased groceries, and cared for the children. While the parties were married, wife at times worked part-time outside the home.
By December 2009, husband’s equity interest in the farming operation had increased by $1,896,516. That year, husband signed wife up for a federal farm program, and, although he testified that wife was not contributing to the farm, husband represented to the government that they were in a 70/30 joint venture.
Wife petitioned for marriage dissolution in April 2010. During the dissolution action, wife moved to set aside the antenup-tial agreement on the grounds that it “was a product of duress and coercion” and that she did not have “sufficient legal advice” to fully understand the agreement. Wife further claimed that the agreement was unfair at inception and that it was unfair at enforcement due to wife’s change in financial circumstances. The district court bifurcated the dissolution action, separating the property issues from the other issues for later resolution. After a hearing in 2011, the district court concluded that the agreement was invalid.
The parties’ marriage was dissolved on January 10, 2012, and they agreed to that date as the valuation date of assets. Husband claims that the dissolution affected his ability to obtain financing and that he had to downsize his farming operation in 2012. Husband farms land that he rents; he does not own tillable land. Husband’s father also farms. From 2009 to 2011, husband farmed approximately 2,500 acres, and his father farmed approximately 500 acres. During 2012, husband downsized his farming operation to 172 acres. Husband also sold $1.5 million of stored grain, paid off a debt, and purchased new equipment, which he used to custom farm his father’s *46 land for no pay.[1] That year, husband’s father farmed the balance of the land previously farmed by husband in the operation, totaling about 3,000 acres.
After a two-day trial on the property issues in December 2014 and January 2015, the district court filed an order requiring husband to pay both temporary rehabilitative and permanent spousal maintenance. In addition, the district court found husband’s claim that he was forced to reduce his farm operation not credible and concluded that husband dissipated $1.5 million in assets during the dissolution proceeding in violation of Minn. Stat. § 518.58, subd. la (2016). The district court ordered husband to pay $750,000 as an equitable distribution of marital property. The district court also ordered husband to pay $168,000 toward wife’s need-based attorney fees. Husband appeals.
ISSUES
I. Did the district court err in concluding that the parties’ antenuptial agreement is invalid?
II. Did the district court abuse its discretion in its division of the marital estate?
III. Did the district court abuse its discretion in awarding spousal maintenance?
IV. Did the district court abuse its discretion in awarding respondent need-based attorney fees?
ANALYSIS
I. The district court did not err in invalidating the antenuptial agreement.
Wife contested the validity of the parties’ antenuptial agreement. The agreement addresses the disposition of nonmari-tal and marital property, as well as spousal maintenance, upon dissolution of the marriage. The district court awarded husband his nonmarital property, and wife does not challenge that decision. However, the district court concluded that the antenuptial agreement was invalid and awarded wife marital property and spousal maintenance without regard to the agreement. Husband argues that the district court erred in invalidating the agreement.
“Statutory construction is a question of law, which this court reviews de novo.” In re Estate of Rutt, 824 N.W.2d 641, 645 (Minn. App. 2012) (quotation omitted), review denied (Minn. Jan. 29, 2013). Where the relevant facts are undisputed, the application of a statute to those facts is a question of law we undertake de novo. Id. Where facts are in dispute, appellate courts will defer to the findings of the district court, unless those findings are clearly erroneous. Rasmussen v. Two Harbors Fish Co., 832 N.W.2d 790, 797 (Minn. 2013). We defer to the district court’s credibility determinations. Sefkow v. Sefkow, 427 N.W.2d 203, 210 (Minn. 1988).
A. Standard of law
The critical initial issue is identifying the appropriate legal standard for evaluating the validity of antenuptial agreements that, like the one at issue here, are entered into after the effective date of Minn. Stat. § 519.11 (2016), and that address marital property. Section 519.11 states that it “shall apply to all antenuptial contracts and settlements executed on or after August 1, 1979.” Minn. Stat. § 519.11, subd. 6. Here, it is undisputed that the parties’ antenuptial agreement was executed after *47 August 1, 1979. Therefore, the statute applies to the parties’ agreement.
Under subdivision 1 of the statute,
[a] man and woman of legal age may enter into an antenuptial contract or settlement prior to solemnization of marriage which shall be valid and enforceable if (a) there is a full and fair disclosure of the earnings and property of each party, and (b) the parties have had an opportunity to consult with legal counsel of their own choice. An antenup-tial contract or settlement made in conformity with this section may determine what rights each party has in the non-marital property, defined in section 518.003, subdivision 3b, upon dissolution of marriage, legal separation or after its termination by death and may bar each other of all rights in the’ respective estates not so secured to them by their agreement. This section shall not be construed to make invalid or unenforceable any antenuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if the agreement or settlement would be valid and enforceable without regard to this section.
The first sentence of this subdivision states that an antenuptial agreement “shall be valid” if the parties made full disclosure and had access to counsel. Id., subd. 1. This sentence does not otherwise limit itself. Generally, “‘[s]hall’ is mandatory.” Minn. Stat. § 645.44, subd. 16 (2016). Therefore, if this sentence is read in isolation, it could be argued that it applies to all antenuptial agreements entered into after the effective date of the statute. But we conclude that the Minnesota Supreme Court’s decisions in McKee-Johnson v. Johnson, 444 N.W.2d 259 (Minn. 1989), and In re Estate of Kinney, 733 N.W.2d at 118, direct otherwise.
McKee-Johnson addressed an antenup-tial agreement executed after the effective date of Minn. Stat. § 519.11. 444 N.W.2d at 262. That agreement covered both marital and nonmarital property, but it was challenged only with respect to marital property. Id. at 261. The district court ruled that section 519.11 rendered the portion of the agreement addressing marital property void and unenforceable as a matter of law. Id. at 262. This court affirmed the district court’s ruling, concluding that section 519.11 excluded, as a matter of law, marital-property rights from the scope of rights able to be addressed by an antenup-tial agreement. McKee-Johnson v. Johnson, 429 N.W.2d 689, 692-94 (Minn. App. 1988), rev’d 444 N.W.2d at 261. The supreme court disagreed, concluding that Minn. Stat. § 519.11 does not preclude antenuptial agreements from addressing marital property. McKee-Johnson, 444 N.W.2d at 264-65.
Critical to the supreme court’s ruling in McKee-Johnson was the court’s interpretation of the third sentence of subdivision 1: “This section shall not be construed to make invalid or unenforceable any ante-nuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if the agreement or settlement would be valid and enforceable without regard to this section.” Id. at 263 (quoting Minn. Stat. § 519.11, subd. 1 (1988)). The supreme court reasoned that this sentence was ambiguous, and resorted to the legislative history of section 519.11 to discern the meaning of the sentence. Id. After reviewing the legislative evolution of what became Minn. Stat. § 519.11, the supreme court stated, “[t]he thrust of the bill was directed to codification of procedural fairness requirements in the execution of a valid antenuptial contract and, with re *48 spect to nonmarital property, to make it more difficult to subsequently challenge the validity of an antenuptial agreement covering nonmarital property.” Id. at 264. The court explained that the legislative history showed no hostility to antenuptial contracts addressing marital property. Id. at 265, “To the contrary,” the court wrote, “the statute recognizes the validity of such a contract so long as ‘it would be valid and enforceable without regard to this section.’ ” Id. at 264-65. “Therefore,” the supreme court concluded, “to determine whether the provisions of this contract relating to ‘after acquired’ [ie., marital] property are valid and enforceable, we must look to our common law for guidance.” Id. at 265. McKee-Johnson thus decided that if an antenuptial agreement addresses marital property, its validity is assessed under the common-law standard rather than the statutory standard.[2]
McKee-Johnson then reviewed Minnesota antenuptial-agreement cases decided under common law and stated that those cases show that antenuptial agreements, “if fairly arrived at, following full disclosure of financial condition, and with opportunity to consult independently with counsel, have been favored in the common law of Minnesota—even though marital property was included within their scope.” Id. The supreme court went on to explain that the common-law standard for assessing the validity of antenuptial agreements includes separate inquiries addressing the agreement’s procedural and substantive fairness. Id. McKee-Johnson also stated that (a) “Minn. Stat. § 519.11 did not alter common law rules of procedural or substantive fairness applicable to provisions relating to the allocation of marital property;” and (b) “[t]he procedural review focuses on determining whether at the inception the agreement was fairly procured, and, under the common law, relevant factors to be considered are substantially identical to those which the legislature codified in Minn. Stat. § 519.11, subd. 1 (1988).” Id.
Thus, McKee-Johnson ruled that the two-part disclosure-and-access-to-counsel *49 standard in the first sentence of Minn. Stat. § 519.11, subd. 1, is “substantially identical” to the common-law standard for procedural fairness. Apparently as a result of what McKee-Johnson identified as the symmetrical requirements of the statute and the common law for the procedural fairness of an antenuptial agreement, McKee-Johnson then stated that “[u]nder the common law, and, as well, the statute,” procedural fairness requires full financial disclosure and the opportunity to consult counsel. Id. at 265-66. Critical for purposes of this appeal is the idea that, according to McKee-Johnson, both the statutory and common-law standards for assessing the validity of an antenuptial agreement require that the parties to that agreement have had the opportunity to consult independent counsel.[3]
In 2007, the supreme court decided Kinney. Because Kinney involved an antenup-tial agreement entered into in 1969, the agreement was not governed by Minn. Stat. § 591.11. 783 N.W.2d at 122. This court’s unpublished decision ruled the agreement in Kinney invalid under the common law because the wife had not had the opportunity to consult independent counsel. In re Estate of Kinney, No. A05-1794, 2006 WL 1806386, at *3 (Minn. App. July 3, 2006), rev’d 733 N.W,2d at 120. The supreme court disagreed, concluding that “the opportunity to consult with independent counsel is a relevant factor in the analysis,” but it is not “a requirement for a valid antenuptial agreement under common law.” Kinney, 733 N.W.2d at 124.
The supreme court laid out a multi-factor test for assessing whether an ante-nuptial agreement was equitably and fairly made:
(1) whether there was fair and full disclosure of the parties’ assets; (2) whether the agreement was supported by adequate consideration; (3) whether both parties had knowledge of the material particulars of the agreement and, of how those provisions impacted the parties’ rights in the absence of the agreement; and (4) whether the agreement was procured by an abuse of fiduciary relations, undue influence, or duress.
Id. Further, Kinney states both that (a) “[w]e hold that the opportunity to consult with independent counsel is not a requirement, but is one of several relevant factors that courts may consider when determining whether an antenuptial agreement is fair and equitable and therefore enforceable under common law;” and (b) “[t]o the extent that McKee-Johnson ... could be read to indicate otherwise, [it is] overruled on that issue.” Id. at 125-26. Thus, after Kinney, if the validity of an antenuptial agreement is assessed under the common law, that agreement may be valid even if a party lacked the opportunity to consult independent counsel.
Integrating these two supreme court decisions, we conclude that the district court, in accordance with McKee-Johnson, should have evaluated the ante-nuptial agreement under the common-law standards of procedural and substantive fairness and that Kinney articulates the *50 common-law standard of procedural fairness.[4]
B. Application to this case
The district court’s order analyzed the antenuptial agreement for procedural and substantive fairness. Regarding procedural fairness, the district court equated procedural fairness with satisfaction of the statutory provisions of full and fair disclosure and opportunity to consult with legal counsel, and found the agreement procedurally defective because wife did not have a meaningful opportunity to consult counsel of her choice.
To the extent that the district court relied on the statute for the standard for evaluating procedural fairness, the district court erred. As noted above, Kinney identifies the common-law analysis as:
(1) whether there was fair and full disclosure of the parties’ assets; (2) whether the agreement was supported by adequate consideration; (3) whether both parties had knowledge of the material particulars of the agreement and of how those provisions impacted the parties’ rights in the absence of the agreement; and (4) whether the agreement was procured by an abuse of fiduciary relations, undue influence, or duress.
Id. at 124. The opportunity to consult independent counsel is a relevant factor in making that analysis. Id. at 125.
The parties agree that wife bears the burden of proving that the agreement is invalid.[5] The parties do not dispute that *51 there was full and fair disclosure of assets. The district court’s findings do not touch on the adequacy of consideration for the agreement. With respect to the parties’ knowledge of the particulars of the agreement and how they affected their rights, the district court found that wife consulted counsel but did not make findings regarding whether wife had knowledge of provisions of the agreement and how they impacted her rights. The record shows, however, that wife acknowledged in testimony that her attorney explained her rights as a married person and the effect of the agreement in the event of divorce, and wife affirmed that her attorney made no suggestions or recommendations regarding the agreement. Finally, although the district court analyzed the agreement under a different framework, it in essence found that the agreement was procured by duress and, with respect to consultation with counsel, that wife’s opportunity was not meaningful because of the short timeframe and because it was not the counsel of her choice.
The district court based its determination that wife did not have a meaningful opportunity to consult independent counsel on a number of facts. First, husband gave wife the agreement only three days before the parties’ departure for the Cayman Islands for their wedding, despite wife’s mixed reactions to the requirement of an agreement in the parties’ prior discussions. Second, the parties’ families had already paid for, and some had already started, their travels to the wedding site. Third, husband was clear in conversations with wife that if wife did not sign the agreement there would be no wedding, and the district court found husband’s testimony that the agreement was negotiable not credible. Fourth, wife tried to meet with her attorney from a previous matter but was unable to do so. Fifth, wife was previously unaware of husband’s net worth or assets as husband had intentionally kept financial information from her.
As found by the district court, husband “used the wedding deadline to create an atmosphere of pressure that resulted in the [wife] not having an adequate opportunity to negotiate any of the terms of the premarital agreement.” And the record shows that husband did so even though he had spent a month communicating with his lawyer and revising the agreement before presenting it to wife. The findings of fact supporting the district court’s determination that wife was subject to coercion and duress are supported by the record.
Certainly, the fact that wife was advised of her rights by a lawyer (even if not her preferred lawyer) weighs in favor of validity of the agreement. However, the issue of unfair influence or duress is also relevant, and the district court’s findings touching on that issue are supported by the record. Under Kinney's multifactor procedural-fairness test,, we are not left with the firm and definite conviction that the district court erred. See Goldman v. Greenwood, 748 N.W.2d 279, 284 (Minn. 2008) (“Findings of fact are clearly erroneous where an appellate court is left with the definite and firm conviction that a mistake has been made.” (quotation omitted)). And because a lack of procedural fairness is fatal to the *52 validity of the agreement, we affirm the district court’s decision invalidating the antenuptial agreement.
II, The district court did not abuse its discretion in its award of marital property.
Husband argues that the district court abused its discretion in awarding wife $750,000 as part of its equitable division of the marital estate. The district court has broad discretion over the division of marital property. Sirek v. Sirek, 693 N.W.2d 896, 898 (Minn. App. 2005). We will not alter a property division “absent a clear abuse of discretion or an erroneous application of the law,” even if we would have taken a different approach. Id. This court will affirm a district court’s division of property if that division has “an acceptable basis in fact and principle.” Antone v. Antone, 645 N.W.2d 96, 100 (Minn. 2002).
Minn. Stat. § 518.58, subd. 1 (2016), provides that a district court “shall make a just and equitable division of the marital property of the parties” after considering several factors. Those factors include “the length of the marriage, any prior marriage of a party, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, needs, opportunity for future acquisition of capital assets, and income of each party.” Id. The district court must consider the value of services provided by either spouse “as a homemaker.” Id. Additionally, for purposes of equitable division of the marital estate, “[i]t shall be conclusively presumed that each spouse made a substantial contribution to the acquisition of income and property while they were living together as husband and wife.” Id.
The district court found that the value of the marital estate was $1,898,516. The court found that the best evidence of the estate’s value was a December 2009 balance sheet dated shortly before the parties separated in 2010 and signed by both parties, identifying the parties’ assets and liabilities. From that balance sheet, the court determined the parties’ net worth. The court then subtracted from that amount the value of nonmarital assets husband had brought to the marriage. The net result was the value of the marital estate. Husband argues that “the best evidence of the value of the parties’ marital estate is not the December 2009 balance sheet,” but he does not identify better evidence to determine the marital estate’s value. We conclude that the district court’s finding is supported by the record.
The district court also determined that in 2012, during the pendency of the divorce proceedings, husband liquidated approximately $1.5 million in stored grain,
claiming that he lost financing and had to reduce his operation from 3100 acres to 172, but avoided characterizing that as income for taxes due to accelerated depreciation on equipment that obviously used [sic] to farm ground for his father, as it was not necessary for farming a reduced sized operation of 172 acres or so.
The district court found husband’s explanation for downsizing his farming operation in 2012 not credible and not supported by the evidence. The court concluded that husband violated Minn. Stat. § 518.58, subd. la, by “transferring or disposing of marital assets not in the usual course of business by liquidating $1,500,000.00 in grain in 2012 and converting a portion of the proceeds to equipment and building, and using inputs in the sum of $1,600,000.00 to grow, cultivate, and harvest the crops of another in 2012,” without the consent of wife.
The district court additionally concluded that “[husband] shall pay [wife] as and for *53 equitable division of marital property the sum of $750,000.00.” In its memorandum attached to its order, the court explained that wife “is entitled to half of the fraudulently transferred. or disposed of grain sales, or $750,000, as a fair and equitable division of the marital property of the parties, and as compensation to [wife] for [husband’s] diversion of marital assets without her permission or consent.”
While the record contains conflicting evidence as to whether husband’s 2012 conduct constituted a dissipation of marital assets, we need not decide whether the district court’s finding of dissipation was clearly erroneous. Husband argues that the district court’s dissipation determination was error, but he does not demonstrate how the value of the marital estate would materially change without the dissipation determination. As explained by the dissent, if this transaction is not dissipation, it is zero-sum, and therefore has no effect on the value of the marital estate. As the appellant, it is husband’s burden to demonstrate not- only that the district court’s resolution of the dissipation issue was error, but also that this error resulted in a prejudicial change to value of the marital estate. See Minn. R. Civ. P. 61 (requiring appellate courts to ignore harmless error); Johnson v. Johnson, 277 N.W.2d 208, 211 (Minn. 1979) (“Exactitude is not required of the [district] court in the valuation of assets in a dissolution proceeding; it is only necessary that the value arrived at lies within a reasonable range of figures.”).
The district court concluded that wife was entitled to $750,000 as a fair and equitable division of marital assets and as compensation for husband’s diversion of assets. We need not examine the validity of the district court’s underlying reasons for choosing $750,000 as the exact figure if we determine that husband failed to prove that the figure does not represent an equitable division of. the marital estate. See Katz v. Katz, 408 N.W.2d 835, 839 (Minn. 1987) (“[Appellate courts] will not reverse a correct decision simply because it is based on incorrect reasons.”). Based on the conclusive statutory presumption that wife substantially contributed to the acquisition of income and property during the marriage, and the district court’s findings that wife worked throughout the marriage both on the farm and as a homemaker, we cannot conclude that a division of the marital estate that awards wife approximately 40% of the marital estate is a clear abuse of discretion with no basis in fact or principle.
III. The district court did not err in awarding temporary rehabilitative spousal maintenance, but did err in determining its award of permanent spousal maintenance.
Husband argues the district court also abused its discretion by awarding wife both temporary rehabilitative and permanent spousal maintenance. Minn. Stat. § 518.552, subd. 2 (2016), authorizes a district court to grant maintenance to either spouse “in amounts and for periods of time, either temporary or permanent, as the court deems just.” The statute explicitly rejects a presumption for temporary awards, instead instructing that in the case of “uncertainty as to the necessity of a permanent award, the court shall order a permanent award leaving its order open for later modification.” Minn. Stat. § 518.552, subd. 3 (2016). The district court “has broad discretion in deciding whether to award maintenance and before an appellate court determines that there has been a clear abuse-of that discretion, it must determine that there must be a clearly erroneous conclusion that is against logic and the facts on record.” Dobrin v. Dobrin, 569 N.W.2d 199, 202 (Minn. 1997).
*54 As a threshold matter, husband argues that wife waived her rights to spousal maintenance during her testimony at the 2011 hearing on the validity of the antenuptial agreement. However, from our review of the record, it does not appear that husband raised this issue during the trial. Thus, the issue of waiver of spousal maintenance is not properly before us. See Thiele v. Stich, 425 N.W.2d 580, 582 (Minn. 1988) (“A reviewing court must generally consider only those issues that the record shows were presented and considered by the [district] court in deciding the matter before it.” (quotation omitted)).[6]
The district court awarded wife temporary rehabilitative spousal maintenance in an amount of $1,725 per month for the period from the parties’ separation until the court’s order. Because five years had already passed, the monthly award was converted to a liquidated payment of $103,500. In addition to the lump-sum rehabilitative maintenance, the district court also awarded wife $862 per month in permanent maintenance, starting the month of the court’s order. The court explained, “[Although [wife] has established a basis for a permanent award of maintenance, she has not demonstrated justification for the figure asserted. The Court has awarded approximately 1/2 of the temporary amount, or $862.00 per month, as a permanent maintenance amount.”
There is ample evidence in the record demonstrating that the district court weighed the appropriate statutory factors and determined that wife met her burden in demonstrating her need for temporary rehabilitative spousal maintenance.
The district court addressed the eight factors listed in Minn. Stat. § 518.552, subd. 2(a)-(h), making specific findings for each. For instance, regarding the statutory factor of the financial resources of the parties, the district court found that husband “has significant financial resources due to his successful grain farming operation, and [wife] has limited ability to meet her needs independently.” Regarding the statutory standard-of-living factor, the district court found “that the parties lived a high standard of living during their marriage, with living expenses approaching $9,000 a month.” In considering the statutory factors of length of marriage and loss of earnings, the district court found that wife “credibly testified that [husband] did not want her working outside the home,” causing her “diminishment in some work skills outside the farm.” Considering the statutory factors of age and the physical and emotional condition of the spouse seeking maintenance, the district court noted that wife was “44 years old and in reasonable physical and emotional condition.” Because the district court exercised its discretion in a manner consistent with the requirements of section 518.552, and because the facts cited in the court’s discussion of each of the eight factors have support in the record, we cannot conclude that the award of temporary rehabilitative maintenance from 2010 through the date of the order is clearly erroneous.
With respect to the award of permanent spousal maintenance on a going-forward basis from the date of the order, however, we conclude that the district *55 court’s findings are insufficient. Minn. Stat. § 518.552, subd. 1 (2016), allows a district court, in its discretion, to award spousal maintenance if the spouse seeking maintenance:
(a) lacks sufficient property, including marital property apportioned to the spouse, to provide for reasonable needs of the spouse considering the standard of living established during the marriage, especially, but not limited to, a period of training or education, or
(b) is unable to provide adequate self-support, after considering the standard of living established during the marriage and all relevant circumstances, through appropriate employment, or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.
(Emphasis added.)
As part of the equitable distribution of the marital estate, the district court awarded wife $750,000 in liquid assets. While a spouse is not expected to invade the principal of investments to meet his or her monthly living expenses, Minnesota has “long recognized that a district court must consider all income of the requesting spouse, including income generated from marital property received in the dissolution.” Curtis v. Curtis, 887 N.W.2d 249, 252 (Minn. 2016). The district court did not include any findings indicating that it took into consideration the income from this liquid asset in its computations of wife’s earning potential for purposes of permanent spousal maintenance. It is therefore unclear whether the district court took this income into account.
Therefore, we remand to the district court the issue of permanent spousal maintenance with instructions to recalculate wife’s earning potential, taking into consideration potential investment income generated from the marital property distribution, and to adjust the permanent-spousal-maintehance award, if appropriate.
IV. The district court did not abuse its discretion in awarding attorney fees.
Finally, husband argues that the district court abused its discretion when it awarded wife need-based attorney fees.
We review a district court’s award of need-based attorney fees for an abuse of discretion. Gully v. Gully, 599 N.W.2d 814, 825 (Minn. 1999); but see Minn. Stat. § 518.14, subd. 1 (2016) (stating that the district court “shall” award need-based attorney fees if the statutory requirements are met). A district court “shall award attorney’s fees, costs, and disbursements in an amount necessary to enable a party to carry on or contest the proceeding” where it finds:
(1) that the fees are necessary for the good faith assertion of the party’s rights in the proceeding and will not contribute unnecessarily to the length and expense of the proceeding;
(2) that the party from whom fees, costs, and disbursements are sought has the means to pay them; and
(3) that the party to whom fees, costs, and disbursements are awarded does not have the means to pay them.
Minn. Stat. § 518.14, subd. 1.
Here, the record supports the finding by the district court that wife’s attorney fees were necessary for the good-faith assertion of her rights because wife needed to assert her rights to custody, marital property, and spousal maintenance throughout the proceedings. In addition, based on wife’s low wages and reliance on government assistance, it was not clear error for the district court to conclude that wife could not pay her own attorney fees. Finally, *56 husband’s successful career as a grain farmer, with annual gross income near or greater than $100,000 between 2009 and 2013, indicates that the district court did not err in determining that he could pay attorney fees. As a result, the district court did not abuse its discretion when it awarded wife $168,000 in attorney fees.
DECISION
Although the district court did not evaluate the procedural fairness of the ante-nuptial agreement using the proper common-law standard, because the district court’s findings of fact support the conclusion that the agreement is invalid under the common-law standard, we affirm the district court’s order declaring the ante-nuptial agreement procedurally invalid. We also conclude that the district court did not abuse its discretion in its equitable division of the marital estate, its determination of temporary rehabilitative spousal maintenance, or its award of need-based attorney fees to wife. However, we remand for additional findings as to wife’s earning potential, taking into consideration the marital-property division, and an adjustment of permanent maintenance, if appropriate.
Affirmed in part, reversed in part, and remanded.
Concurring in part, dissenting in part, Hooten, Judge

. Expert testimony valued husband’s work for his father at $354,558 to $430,218. The expert also testified that 2012 was the most successful year in grain farming in a lifetime.

. The dissent argues that the third sentence of Minn. Stat. § 519.11, subd. 1, operates as a savings clause to validate agreements that would otherwise be invalid under the statute. According to the dissent, the savings clause thus operates in one direction, toward validity: Agreements that satisfy statutory procedural fairness would not be invalid even though they fail common-law procedural fairness, while agreements that fail statutory procedural fairness would not be invalid as long as they satisfy common-law procedural fairness. We do not believe that this interpretation squares with McKee-Johnson, which, after noting that Minn. Stat. § 519.11 did not preclude antenuptial agreements from addressing marital property, stated that "therefore” the court “must look to our common law for guidance” regarding whether the antenuptial agreement was “valid and enforceable” regarding marital property. McKee-Johnson, 444 N.W.2d at 265. Alternatively stated: It was because the McKee-Johnson antenuptial agreement addressed marital property that McKee-Johnson invoked the common law. The dissent also argues that the "plain language” of the first sentence of Minn. Stat. § 519.11, subd. 1, requires application of statutory procedural fairness to all antenuptial agreements executed after the statute's effective date, and to do otherwise is to rewrite the sentence or render it meaningless. But that sentence states that "an antenuptial [agreement] ... shall be valid and enforceable” if there was full disclosure and access to counsel. Minn. Stat. § 519.11, subd. 1 (emphasis added). Clearly that "plain language" does not hold, because McKee-Johnson requires evaluation of substantive fairness before an antenuptial agreement addressing marital property is determined to be valid and enforceable. If the first sentence of subdivision 1 applies to all antenuptial agreements, and if that sentence is satisfied, why a court must also address the substantive fairness of an agreement that is already valid and enforceable becomes unclear.

. Portions of McKee-Johnson arguably could be read to suggest that its assessment of the procedural fairness of the antenuptial agreement was somehow based on the statute. See, e.g., 444 N.W.2d at 265 (stating that “[u]nder the common law, and, as well, the statute, one standard relative to the procedural fairness requirement is met whenever the proponent has established .,. ”). We believe, however, that a fair reading of McKee-Johnson shows that these references to the statute arise from what McKee-Johnson identified as the symmetrical requirements of the statute and the common law, not any dependence on the statute.

. The dissent argues that our reading of McKee-Johnson creates a potential for confusion. The dissent asserts that, under our reading, a single antenuptial agreement addressing both marital and nonmarital property could be subject, simultaneously, to multiple (different) tests for determining its validity, thereby creating the possibility of inconsistent results under those different tests. To be clear, we conclude that the validity of an antenup-tial agreement addressing marital properly is determined solely by the common-law procedural-and-substantive-fairness test, whether or not that agreement also addresses nonmar-ital property.
We believe that this conclusion is compelled by the third sentence of subdivision 1 of the statute, as that sentence was interpreted by the supreme court in McKee-Johnson: That sentence refers to antenuptial agreements that "cover[] or include!] marital property." Minn, Stat. § 519.11, subd. 1. After finding the sentence ambiguous, the supreme court interpreted the sentence to require application of the common law to determine the validity of such agreements. And, after identifying the common-law standard for procedural fairness, which the statute "did not alter," the' supreme court ruled that the agreement in McKee-Johnson was procedurally fair, and remanded the case to the district court for "review of the substantive fairness of the agreement” at inception and, if necessary, its fairness at enforcement. McKee-Johnson, 444 N.W.2d at 265, 267 (emphasis added). Based on McKee-Johnson's construction of the statute, there is only one test that applies to antenuptial agreements addressing marital property, and that one test is the cómmon-law procedural-and-substantive-fairness test. In contrast, under the dissent's analysis, if an agreement including marital property fails the statutory test for procedural fairness, that same agreement must then be analyzed under the common-law procedural fairness test, with the possible result that the same agreement could be procedurally unfair under the statute but procedurally fair under the common law. We believe this reading of Minn. Stat. § 519.11 introduces more, not less, confusion and uncertainty into the process of assessing the validity of antenuptial agreements. We also believe it unlikely that this two-step assessment of procedural fairness was contemplated by McKee-Johnson. According to McKee-Johnson, the statutory pro-cédural-fairness test and the common-law procedural-fairness test were identical; there would have been no reason to apply the same test twice.

. Kinney states:
[Ujnder common law the burden of proof is on the proponent of an antenuptial agreement when (1) the parties stand in a confidential relationship and (2) the agreement *51 is not supported by adequate consideration. But when ... the parties stand in a confidential relationship and the district court finds that the antenuptial agreement is supported by adequate consideration, we conclude that under common law the burden is on the party challenging the agreement. 733 N.W.2d at 127 (footnote omitted). Kinney also notes that "[a] confidential or fiduciary relationship between the parties to an ante-nuptial agreement is usually presumed.” Id. at 124 n.7.

. To the extent that husband believes he raised the issue to the district court, the district court, by virtue of awarding spousal maintenance, implicitly found that wife did not waive it, and our review of the 2011 testimony of wife would support such an implicit finding. Wife’s 2011 testimony may be fairly read as merely acknowledging that the antenuptial agreement, which she was contesting, included waiver of spousal maintenance, not that wife was waiving her claim to spousal maintenance going forward, irrespective of the agreement.