LILLEHAUG, Justice.
*620 Appellant Robbie Michael Kremer appeals from a district court order invalidating an antenuptial agreement he entered into with his then-fiancée, respondent Michelle Beth Kremer.[1] The antenuptial agreement contained provisions concerning the disposition of both marital and nonmarital property upon dissolution or death. The district court held that, under Minn. Stat. § 519.11 (2016), the agreement was procedurally unfair because Michelle did not have an adequate opportunity to consult with an attorney. The court of appeals affirmed-holding that the agreement was procedurally unfair-but applied the common-law test for procedural fairness from In re Estate of Kinney , 733 N.W.2d 118 (Minn. 2007). Robbie petitioned for review, arguing that section 519.11 applied to the agreement and that the statute's procedural conditions were satisfied because both parties engaged in full and fair financial disclosure, and both parties had an opportunity to consult with an attorney. We affirm the court of appeals.
FACTS
For almost three years, Robbie and Michelle lived together as a couple on a farm in Fulda, Minnesota. Robbie owned and operated a farming enterprise. Michelle had three children from a previous marriage. Robbie told Michelle that he would require an antenuptial agreement if they ever married. Michelle was ambivalent about such an agreement, and the parties did not discuss or negotiate any terms.
In August 2000, Robbie and Michelle decided to marry. They scheduled a destination wedding in the Cayman Islands for March 2001.
As the wedding approached, and without telling Michelle, Robbie contacted an attorney to prepare an antenuptial agreement. Robbie had a minimum of six contacts with the attorney over the course of at least a month. Without Michelle's knowledge, he furnished the attorney with copies of her tax returns.
On February 26, 2001, at his attorney's office, Robbie signed the antenuptial agreement ("the Agreement"). Later that day, he presented the Agreement to Michelle. Robbie made clear that if Michelle did not sign the Agreement, the wedding was off. The couple was scheduled to leave for the Cayman Islands just three days later. Family members had paid for their lodging and airfare to the destination, and some were already en route.
After being presented with the Agreement, Michelle attempted unsuccessfully to meet with the attorney who represented her in a previous divorce. On February 28, she met with a different attorney with whom she had no experience. The attorney explained the terms of the Agreement, her rights under the law, and the potential impact of the Agreement upon dissolution of the marriage or Robbie's death. After receiving legal advice, Michelle signed the Agreement. The next day, the couple left for the Cayman Islands to be married.
The Agreement specified that, upon dissolution, "[e]ach party shall retain his or her Property free of any right or claim of the other." Under the Agreement, "[a]ny *621 assets acquired during the marriage ... [would be] divided between the parties in proportion to the monetary consideration provided by each." Under the Agreement, both parties surrendered their rights to "alimony or maintenance." The parties certified that they had been advised of their rights and of the nature and probable value of each other's property.
Robbie and Michelle had one child together, born in 2008. Over the course of the marriage, Michelle contributed to the farming operation, the value of which increased significantly. She did not herself earn much income.
The marriage did not endure. In 2010, Michelle petitioned for dissolution and moved to set aside the Agreement, arguing that it was unfair. The district court agreed and invalidated the Agreement. The court applied Minnesota Statutes § 519.11, which provides that antenuptial agreements "shall be valid" if the parties satisfy two conditions-"(a) there is a full and fair disclosure of the earnings and property of each party, and (b) the parties have had an opportunity to consult with legal counsel of their own choice." Minn. Stat. § 519.11, subd. 1. The court concluded that the Agreement was procedurally unfair because Michelle did not have an "adequate opportunity to meet with legal counsel of her own choice." The court found that Robbie intentionally "used the wedding deadline to create an atmosphere of pressure" under which Michelle was "pressured/coerced" into signing the Agreement. The court also concluded that the Agreement was substantively unfair at the time it was made and executed, but it did not conclude whether the Agreement was substantively unfair at the time of its enforcement.
In a published opinion, the court of appeals affirmed the district court's order invalidating the Agreement, but on different grounds. Kremer v. Kremer , 889 N.W.2d 41 (Minn. App. 2017). The court of appeals concluded that, "to the extent that the district court relied on [ section 519.11 ] for evaluating procedural fairness, the district court erred." Id. at 50. The court of appeals determined that agreements that purport to distribute marital property, such as the Agreement between Robbie and Michelle, must be evaluated under the common law, regardless of whether they also address nonmarital property. Id. at 50 n.4. Applying the multifactor common-law test articulated in In re Estate of Kinney , 733 N.W.2d 118, to the findings of the district court, the court of appeals determined that the Agreement was procedurally unfair. Kremer, 889 N.W.2d at 50-52. Because "a lack of procedural fairness is fatal to the validity" of an antenuptial agreement, the court of appeals did not address the issue of substantive fairness. Id. at 51-52.
One judge on the panel dissented in part, concluding that the statutory framework applied by the district court was the appropriate standard. Id. at 56 (Hooten, J., dissenting in part). But the dissent would have reversed the district court's order invalidating the Agreement on the theory that the statute's procedural conditions were satisfied. Id. at 60.
We granted Robbie's petition for review to address the validity and enforceability of the Agreement under Minn. Stat. § 519.11 and the common law.[2]
ANALYSIS
Antenuptial agreements must be fair, both procedurally and substantively.
*622 McKee-Johnson v. Johnson , 444 N.W.2d 259 (Minn. 1989). Two sources of Minnesota law govern the procedural fairness of antenuptial agreements: section 519.11 and the common law. This case requires us to determine which law governs antenuptial agreements that address both marital and nonmarital property. Robbie also asks us to determine that the Agreement was procedurally and substantively fair, and therefore valid and enforceable.
I.
In 1979, the Legislature enacted Minn. Stat. § 519.11, captioned "Antenuptial and Postnuptial Contracts." Previously, antenuptial agreements executed in Minnesota were exclusively governed by the common law, which required such agreements to be both procedurally and substantively fair. See Kinney , 733 N.W.2d at 122 ; McKee-Johnson , 444 N.W.2d at 265. The common-law standard for procedural fairness is whether an agreement was "equitably and fairly made." Kinney , 733 N.W.2d at 122. The common-law standard for substantive fairness is whether an agreement's terms are unconscionable or oppressive. Id. ; McKee-Johnson , 444 N.W.2d at 267.
Section 519.11 modified the common law of procedural fairness for antenuptial agreements executed after August 1, 1979.[3] See Minn. Stat. § 519.11, subd. 6 ; McKee-Johnson , 444 N.W.2d at 263. Subdivision 1 of the statute states that antenuptial agreements "shall be valid" if the parties satisfy two conditions-"(a) there is a full and fair disclosure of the earnings and property of each party, and (b) the parties have had an opportunity to consult with legal counsel of their own choice." Minn. Stat. § 519.11, subd. 1. The second sentence states that agreements "made in conformity with this section may determine what rights each party has in the nonmarital property." Id. (emphasis added). The third sentence provides: "This section shall not be construed to make invalid or unenforceable any antenuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if the agreement or settlement would be valid and enforceable without regard to this section." Id .
We first addressed section 519.11 in our 1989 decision, McKee-Johnson v. Johnson . The primary issue in that case was whether the statute voided provisions of antenuptial agreements purporting to distribute marital property. McKee-Johnson , 444 N.W.2d at 262. In determining that section 519.11 did not void such provisions, we thoroughly reviewed the statute's legislative history, including statements made during committee discussions and floor debates. McKee-Johnson , 444 N.W.2d at 263-64. We concluded that the statute's primary purpose was to codify the procedural fairness requirements for, and make it more difficult to challenge, agreements about nonmarital property. Id . at 264. We highlighted the fact that, during the legislative process, an amendment to address marital property had been added but was later removed. Id. As the bill's original sponsor explained, the statute was "neutral" as to marital property. Id.
As to provisions in agreements that addressed marital property, we said that "we must look to our common law for guidance." Id. at 265. We equated the common-law standard for procedural fairness with the standard (for nonmarital property) in the statute. Id. (stating that the common-law *623 factors for procedural fairness were "substantially identical" to those in section 519.11, subdivision 1 ). Specifically, we said that "one standard relative to the procedural fairness requirement is met whenever the proponent has established that the parties have voluntarily contracted only after full financial disclosure," and "implicit in the procedural fairness analysis is the requirement that each party ... has unrestrained access to advice from independent counsel." Id. at 265-66.
We modified the McKee-Johnson common-law standard in our 2007 decision, In re Estate of Kinney . Unlike in McKee-Johnson , the agreement in Kinney was executed before August 1, 1979, and thus was unquestionably subject to the common law. Kinney , 733 N.W.2d at 122. After a comprehensive review of our case law regarding procedural fairness, we articulated a multifactor common-law balancing test different than the factors we applied in McKee-Johnson . Id. at 124 ; see McKee-Johnson , 444 N.W.2d at 265-66. And we disagreed with McKee-Johnson to the extent that, for procedural fairness, the common-law test required the opportunity to consult with legal counsel. Kinney , 733 N.W.2d at 125 (overruling McKee-Johnson and In re Estate of Serbus , 324 N.W.2d 381 (Minn. 1982), in part).
Since McKee-Johnson and Kinney , we have not considered the relationship between section 519.11 and the common law as applied to antenuptial agreements that address both marital and nonmarital property and were executed after August 1, 1979. We consider that relationship now.
A.
To determine whether the procedural fairness of an agreement addressing both marital and nonmarital property is governed by statute or common law, we begin with the text of section 519.11. Statutory interpretation is a question of law that we review de novo. Caldas v. Affordable Granite & Stone, Inc. , 820 N.W.2d 826, 836 (Minn. 2012). The goal of statutory interpretation is to effectuate the intent of the Legislature. Brayton v. Pawlenty , 781 N.W.2d 357, 363 (Minn. 2010). When the intent of the Legislature is clear from the plain language of the statute, further statutory construction is not necessary. Am. Tower, L.P. v. City of Grant , 636 N.W.2d 309, 312 (Minn. 2001) ; see also Minn. Stat. § 645.16 (2016). A statute should ordinarily be read as a whole to "harmonize all its parts, and, whenever possible, no word, phrase or sentence should be deemed superfluous, void or insignificant." Owens v. Federated Mut. Implement & Hardware Ins. Co ., 328 N.W.2d 162, 164 (Minn. 1983).
We presume that statutes are consistent with the common law, and that the Legislature does not intend to abrogate or modify a common-law rule unless it does so by express wording or necessary implication of the statute. Do v. Am. Family Mut. Ins. Co. , 779 N.W.2d 853, 858 (Minn. 2010).
Section 519.11 reads, in relevant part:
A man and woman of legal age may enter into an antenuptial contract or settlement prior to solemnization of marriage which shall be valid and enforceable if (a) there is a full and fair disclosure of the earnings and property of each party, and (b) the parties have had an opportunity to consult with legal counsel of their own choice. An antenuptial contract or settlement made in conformity with this section may determine what rights each party has in the nonmarital property, defined in section 518.003, subdivision 3b, upon dissolution of marriage, legal separation or after its termination by death and may bar each other of all rights in the respective estates not so secured to them by their *624 agreement. This section shall not be construed to make invalid or unenforceable any antenuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if the agreement or settlement would be valid and enforceable without regard to this section.
Minn. Stat. § 519.11, subd. 1. The statute applies "to all antenuptial contracts and settlements executed on or after August 1, 1979[.]" Id. , subd. 6.
By its plain language, subdivision 1 of section 519.11 limits the reach of the statutory procedural-fairness standard to provisions of antenuptial agreements addressing nonmarital property. The first sentence provides two conditions-full and fair financial disclosure and access to independent counsel-which, if satisfied, are sufficient to make an antenuptial agreement valid and enforceable. The second sentence, however, specifies that such agreements "may determine what rights each party has in the nonmarital property." Id. (emphasis added). In other words, the statutory standard applies only to nonmarital property. That interpretation is supported by the third sentence: regarding agreements that "cover[ ] or include[ ] marital property," the statute "shall not be construed to make [such agreements] invalid or unenforceable" if they "would be valid and enforceable without regard to this section." Id. (emphasis added). The only reasonable interpretation of this language is that the validity of provisions regarding marital property remains governed by the common law.
Read together, the three sentences of section 519.11, subdivision 1, explain the statute's relationship with the common law. The language in the first sentence is conditional rather than mandatory. That is, the sentence tells us that if the parties to an antenuptial agreement (a) engage in full and fair financial disclosure and (b) have the opportunity to consult with legal counsel, then the agreement (with respect to nonmarital property) shall be valid. Thus, conditions (a) and (b) are sufficient conditions for validity, but are not necessary conditions. So, if a party to an antenuptial agreement distributing only nonmarital property did not have an opportunity to consult with counsel of his or her choice, the agreement would not satisfy the statutory standard, but could still be valid under the common law. But, if parties to such an antenuptial agreement satisfy both conditions, that agreement would be automatically valid.
The second and third sentences of section 519.11, subdivision 1, reinforce this reading. The second sentence is conditional as well, stating that conformity with the conditions in the first sentence "may" (not "shall") determine the rights of parties in nonmarital property. The third sentence refers to agreements that "would be valid ... without regard to this section" (under the common law) and does not limit itself to agreements dealing only with marital property.
Thus, as to antenuptial agreements executed on or after August 1, 1979, the plain language of Minn. Stat. § 519.11, subd. 1, offers a procedural fairness "safe harbor" for provisions purporting to distribute nonmarital property. That is, once the statute's two basic conditions are met, provisions of agreements addressing nonmarital property are automatically valid. If the safe harbor does not apply, the common law does.[4]
*625 The dissent's assertion that section 519.11, subdivision 1, applies universally-that is, to all antenuptial agreements including those with provisions that address marital property-is incorrect. By relying exclusively on language in the first sentence of subdivision 1, such an interpretation would read out the other two sentences. This would violate the well-established principle that we interpret statutes as a whole. See Van Asperen v. Darling Olds, Inc. , 254 Minn. 62, 93 N.W.2d 690, 698 (1958) (stating that "various provisions of the same statute must be interpreted in the light of each other."). And it would violate the Legislature's intention. As we noted in McKee-Johnson , the Legislature's statutory purpose was not to amend the law regarding marital property, but to make it more difficult to challenge agreements covering nonmarital property.[5] 444 N.W.2d at 264.
But, argues the dissent, we read McKee-Johnson too broadly and rely on dicta within in it. To the contrary: in McKee-Johnson we read the statute exactly as the Legislature intended. Moreover, in language essential to the disposition of the case, we addressed two other questions: whether the agreement was procedurally fair and whether it was substantively fair. Id. at 265. To answer those questions, we clearly announced: "we must look to our common law for guidance." Id. Thus, the dissent's analysis is inconsistent with our binding precedent.[6]
B.
Having determined that the common law governs provisions of an antenuptial agreement that do not fall within the safe harbor of Minn. Stat. § 519.11, subd. 1, we must next determine: which common-law test applies? In McKee-Johnson , we determined that the relevant factors under the common law were "substantially identical" to those in subdivision 1 of section 519.11-specifically, full and fair financial disclosure and access to independent counsel. 444 N.W.2d at 265.
In Kinney , however, we articulated a different test for procedural fairness under the common law. The Kinney common-law test balances four factors: (1) whether there was fair and full disclosure of the parties' assets; (2) whether the agreement was supported by adequate consideration; (3) whether both parties had knowledge of the material particulars of the agreement and how those provisions impacted the parties' rights in the absence of the agreement; and (4) whether the agreement was procured by an abuse of fiduciary relations, undue influence, or duress. Kinney , 733 N.W.2d at 124. The opportunity to consult with independent counsel remains *626 a "relevant factor," but is not determinative of whether an agreement is procedurally fair. Id.
Today we resolve any tension between McKee-Johnson and Kinney . We hold that the multifactor Kinney test is the common-law test applicable to antenuptial agreements, whether executed before or after August 1, 1979. McKee-Johnson is overruled to the extent that it determined that the common-law and statutory procedural tests were "substantially identical." They are not.
II.
Having discussed section 519.11 and clarified the common-law test, we now determine whether the Agreement between Robbie and Michelle is procedurally fair. To do so, we first determine which provisions, if any, purport to distribute nonmarital property. If the Agreement contains such provisions, we apply the statutory standard-two conditions-to determine whether those provisions are in the "safe harbor." We then apply the Kinney factors to the remainder of the Agreement. If there are no such provisions, or if the provisions are not in the safe harbor, we apply the Kinney factors to the entire Agreement.
A.
Turning now to the Agreement itself, it is a contract, the terms of which we interpret de novo. See Quade v. Secura Ins. , 814 N.W.2d 703, 705 (Minn. 2012). We interpret contract terms consistent with their plain, ordinary, and popular meaning to give effect to the intention of the parties as it appears from the context of the entire contract. Id.
The Agreement contains the following definitions:
2.1 Property. Any reference to the Property of a party means all of such party's interests in assets, whether such assets are Marital Property or Non-marital Property.
2.2 Non-marital Property. A party's Non-marital Property shall consist of such party's interests in assets, real or personal, that are acquired by the party:
2.2.1 Before the marriage or after the date as of which the parties' assets are valued for the purpose of division upon legal separation or termination of the marriage;
2.2.2 By gift, devise or inheritance from a third party to one but not both of the parties; or
2.2.3 In exchange for or as an increase in the value of any such interest.
2.3 Marital Property. A party's Marital Property shall consist of such party's interests in assets, real or personal, that are not Non-marital Property.
Even though these definitions distinguish marital property from nonmarital property, key provisions of the Agreement do not. Instead, the Agreement uses the comprehensive term "Property" in the only provision that governs property rights upon dissolution or separation:
3.2.2 Each party shall retain his or her Property free of any right or claim of the other. Any assets acquired during the marriage from the property of both parties, shall be divided between the parties in proportion to the actual monetary consideration provided by each.
By its use of the term "Property," the Agreement conflates marital and nonmarital property, making it difficult for us to tell whether its provisions purport to distribute nonmarital property. In such circumstances, we cannot say that any of the Agreement's provisions qualify for the statute's safe harbor. Accordingly, we apply *627 the Kinney factors to the entire Agreement to determine whether the Agreement is procedurally fair-"equitably and fairly made."
B.
Whether the Agreement is procedurally fair is a mixed question of law and fact. For the facts, we rely on the findings of the district court, which we will not overturn unless they are clearly erroneous. Firemen's Ins. Co. of Newark, N.J. v. Viktora , 318 N.W.2d 704, 706 n.1 (Minn. 1982) (citing Minn. R. Civ. P. 52.01 ). We assume, without deciding, that Michelle carries the burden of proof as she has in previous stages of this litigation.[7]
Analyzing the Agreement as a whole, we conclude that it was not "equitably and fairly made." Specifically, two of the Kinney factors-whether the Agreement was supported by adequate consideration and whether the Agreement was procured by duress-weigh heavily in Michelle's favor.
First, there was inadequate consideration. Ordinarily, our inquiry into consideration supporting contracts is easily satisfied-we accept any exchange that has value under the law. Estrada v. Hanson , 215 Minn. 353, 10 N.W.2d 223, 225 (1943). In the antenuptial context, however, we require more. Because antenuptial agreements typically involve parties in a confidential relationship, capable of exploitation, we inquire into whether consideration supporting antenuptial agreements is "adequate." See Kinney , 733 N.W.2d at 122-23 (discussing Slingerland v. Slingerland , 115 Minn. 270, 132 N.W. 326, 328-28 (1911) ).
In assessing the adequacy of consideration, we examine the circumstances surrounding the execution and enforcement of antenuptial agreements to determine whether they are fair and equitable. See In re Estate of Serbus , 324 N.W.2d 381, 385 (Minn. 1982) (examining the value of the deceased husband's estate and the wife's share under the agreement); Slingerland , 132 N.W. at 328 (noting that the husband and wife had been married 20 years and had four living children at the time of his death). Thus, we have held that an antenuptial agreement must sufficiently provide for the financially disadvantaged spouse. See Serbus , 324 N.W.2d at 385 (stating that "[t]he consideration for the antenuptial contract was clearly inadequate" where the wife would receive "far less than she would be entitled to" in the absence of the contract and that under the contract she would receive "the sum of $4,000 and a life estate in the homestead and its furnishings."); In re Malchow's Estate , 143 Minn. 53, 172 N.W. 915, 917 (1919) (determining that consideration was inadequate where the wife would receive "but a small portion of what she would otherwise get under the statutes"); Slingerland , 132 N.W. at 328 (determining that consideration was "pitifully inadequate" where enforcing the agreement would *628 leave the wife "penniless").[8]
In this case, the language of the Agreement appears equitable on its face given that "each party renounces any right to claim alimony or maintenance" and "[e ]ach party shall retain his or her Property free of any right or claim of the other." (Emphasis added.) But the circumstances reveal that these terms are patently one-sided. Here, Robbie came into the relationship with significant assets which increased in value over the course of the marriage, and Michelle came into the marriage with very little. If the Agreement were enforced, she would leave the marriage with very little. Yet Michelle contributed to Robbie's farm operation throughout the marriage, maintained the household, and cared for the couple's child. We cannot conclude that the consideration Michelle received for executing this Agreement was anywhere near adequate.
The second Kinney factor weighing heavily in Michelle's favor is that this Agreement was procured by duress. Duress is coercion by means of threats or other circumstances that destroy the victim's free will and compel her to comply with some demand of the party exerting the coercion. Wise v. Midtown Motors , 231 Minn. 46, 42 N.W.2d 404, 407 (1950). "The test is not the nature of the threats, but rather ... whether or not the [victim] really had a choice," whether the victim had the "freedom of exercising [her] will." Id. (internal quotation marks omitted). Thus, the issue here is whether Michelle acted of her own free will, or whether her free will was overcome by Robbie and the circumstances surrounding the execution of the Agreement.
As the district court found, "there was an overreaching" because Robbie "intentionally created a situation where [Michelle] was pressured/coerced into signing" the Agreement. This finding is well-supported by the record. Michelle's free will was overcome by Robbie's threat to call off the wedding and the limited amount of time that Michelle had to consider the Agreement, consult with an attorney, and decide whether to sign it or not. Robbie knew that Michelle had reservations about signing an antenuptial agreement and that no terms had been negotiated. She was completely in the dark for more than a month while Robbie received legal advice and prepared the Agreement. Robbie presented Michelle with his signed Agreement a mere three days before they were scheduled to depart for their destination wedding. As a result, Michelle was left to scramble to find an attorney, with whom she met on the day before the couple's departure.
Before the district court, Robbie attempted to discount the implications of his tactics, claiming that his attorney had advised him not to tell Michelle about the Agreement or its terms and that Michelle had every opportunity to negotiate. The district court did not find these assertions to be credible. To the contrary, the district court determined that Robbie intentionally created a situation that "took away [Michelle's] ability to seek counsel of her own choice and receive and digest [an attorney's] advice in any meaningful way." These facts show that Robbie procured the Agreement by duress.
*629 Due to the significant weight of these two factors-inadequate consideration and duress-the remaining Kinney factors cannot outweigh them. Even if we assume that Robbie's financial disclosure in the form of exhibits attached to the Agreement constituted full and fair disclosure, and assume that Michelle actually understood the impact of the Agreement on her rights, we conclude that this Agreement did not satisfy the common law test for procedural fairness. It is therefore invalid and unenforceable.[9]
CONCLUSION
For the foregoing reasons, we affirm the decision of the court of appeals.
Affirmed.
THISSEN, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.
Dissenting, Anderson, J.
DISSENT

For ease of reference, we will use the parties' first names.

The court of appeals also resolved issues regarding spousal maintenance, property division, and attorney fees, 889 N.W.2d at 52-56, but we did not grant review of these issues.

There is no dispute that section 519.11 addresses only procedural fairness, and that antenuptial agreements must also be substantively fair under the common law. See McKee-Johnson , 444 N.W.2d at 263.

This interpretation resolves any tension between subdivision 1 and subdivision 6 of section 519.11. Subdivision 6 states that the statute applies to "all antenuptial contracts or settlements executed on or after August 1, 1979." We decline to read subdivision 6 to override the common law's applicability to antenuptial agreements executed on or after August 1, 1979. To do so would be inconsistent with the plain language of subdivision 1 and with our presumption that statutes shall not be interpreted to abrogate the common law unless they do so expressly. See Do , 779 N.W.2d at 858.

The dissent's reading of section 519.11 is not helped by invoking section 518.003, subdivision 3b, which defines nonmarital property as, among other things, property "excluded by a valid antenuptial contract." Minn. Stat. § 518.003, subd. 3b(e) (2016). The dissent's invocation of this definition is circular. For an antenuptial contract to be "valid," it must satisfy either the statute or the common law. This one was not valid, because it satisfied neither.

Were the dissent correct, we should have said in Kinney that we erred in McKee-Johnson when we applied the common law. We did not say that. In Kinney , as explained below, we only modified the common-law standard that McKee-Johnson applied. Kinney , 733 N.W.2d at 125.

Ordinarily, the burden of proving that an antenuptial agreement is unfair and therefore invalid is on the challenger of the agreement under both the statute and the common law. See Minn. Stat. § 519.11, subd. 5 ; Kinney , 733 N.W.2d at 127. Under the common law, however, if the parties are in a confidential relationship and the agreement is not supported by adequate consideration, a presumption of fraud arises and the burden shifts to the proponent of the agreement. Kinney , 733 N.W.2d at 127.
The district court assigned the burden of proof to Michelle and the court of appeals did not address whether the burden shifted to Robbie under the common law. We need not decide the issue. The result is the same regardless of who has the burden.

On one occasion, we said that marriage itself is sufficient consideration to support an antenuptial agreement. See In re Appleby's Estate , 100 Minn. 408, 111 N.W. 305 (1907). But we later clarified that this is only the case where both spouses have independent means or the agreement in question substantially provides for both spouses. See Welsh v. Welsh , 150 Minn. 23, 184 N.W. 38, 38-39 (1921).

Shortly after oral argument, Michelle filed a motion for attorney fees and costs in connection with this appeal. Her motion does not contain sufficient information to allow us to determine appropriate fees. See Minn. R. Civ. App. P. 139.06. Thus, her motion is denied without prejudice, and she may renew that motion within the time allowed by Minn. R. Civ. App. P. 139. In denying this motion, we only address Michelle's request for fees and costs before this court, and we do not address any outstanding motions before the district court or court of appeals.