In re ESTATE of Eldo K. ASPENSON,
a/k/a Eldo Keith Aspenson, Deceased.

No. C0–90–2560.

Court of Appeals of Minnesota.

May 21, 1991.

Patrick F. Flaherty, Jennifer A. Brooks, Jeanne K. Stretch, Moss & Barnett P.A., Minneapolis, for appellant spouse.

Randel I. Bichler, The Joseph R. Gadola Law Office, Wells, for respondent personal representative.

Considered and decided by PETERSON, P.J., and PARKER and FOLEY, JJ.

## OPINION

FOLEY, Judge.

This is an appeal from a probate order denying a claim for an intestate share of an estate under Minnesota's omitted spouse statute. Appellant Beverly K. Aspenson argues a transfer was not made to her "in lieu of a testamentary provision" under Minn.Stat. § 524.2–301(a) (1988). She also challenges the trial court's determination that an antenuptial agreement applies to marital assets. We affirm.

## FACTS

Eldo K. Aspenson, a/k/a Eldo Keith Aspenson, executed a will on January 4, 1980. At that time, Eldo was unmarried and had no children. Under the terms of the will a nephew received specific personal property, a church received a monetary bequest and the remainder of the estate went to nieces and nephews.

Eldo met Beverly in August 1980. They were married on July 19, 1981. He was 53 years old and she was 50 years old. Before the wedding each consulted a separate attorney and executed an antenuptial agreement. The agreement enumerated their assets and provided they would keep their individual assets in the event of death or divorce. They also agreed to separate assets acquired during the marriage. There is no dispute the antenuptial agreement accurately and fairly disclosed their assets. At the time of the antenuptial agreement, the net value of Eldo's property was $280,000. The net value of Beverly's property was $274,000.

Beverly kept her income from her assets in a separate joint bank account and managed her own income and property during the marriage. She also managed Eldo's finances. His accounts were held jointly with her. Most of the money deposited was from Eldo's income. One joint account included rental property income of Beverly.

During the marriage, Eldo transferred property to Beverly. The trial court found:

a. Eldo made Beverly the beneficiary on his term life insurance through his employment. She received the sum of $20,000.00 as a result of his death.

b. Eldo made Beverly the beneficiary on his IDS stock. She received in excess of $6,000.00 in value at the time of his death.

c. Eldo made Beverly the beneficiary on his three IRA accounts at Midwest Federal. She received over $5,000.00 upon his death.

d. Eldo made Beverly the beneficiary on his Great Oak Annuity. She received over $6,000.00 in value upon his death.

e. Beverly was made the joint owner of Eldo's checking account which he had used for his separate business which contained in excess of $5,800.00 at the time of his death. Those funds passed to Beverly upon Eldo's death.

f. The funds in the checking account at Summit Southview Bank, an amount in excess of $5,600.00, passed to Beverly upon Eldo's death.

g. In June of 1989, $35,000.00 worth of Eldo's separate Treasury Bills were changed into joint ownership. Those funds passed to Beverly at the time of Eldo's death.

h. Eldo had joint CD's with Beverly at Midwest Federal totaling in excess of $25,400.00 which passed to Beverly at the time of his death.

i. Eldo had $30,000.00 in Federal Bonds in joint ownership with Beverly which passed to her upon his death.

j. Eldo had pension benefits through his Union with survivors benefit provisions resulting in a benefit to Beverly of $96,000.00 ($1,600.00 per month for five years).

Eldo died on October 17, 1989. His will was filed with the court on March 14, 1990. The trial court found his probate estate was:

> $150,000.00 in Treasury Bills plus interest thereon; a Ford LTD automobile; a 1949 Plymouth automobile; a house in Kiester, Minnesota, valued at under $10,000; 40 acres in Faribault County, Minnesota, valued at under $50,000; and a home and its contents in St. Paul, Minnesota, valued at $65,000 to $70,000.

As either a beneficiary or surviving joint tenant, Beverly received $280,000 and a 1987 Mercury Marquis from assets acquired during the marriage.

On May 8, 1990, Beverly petitioned for an intestate share as a spouse omitted from the will. Following a hearing, the trial court denied her claim by order of November 2, 1990. Beverly appeals.

This court granted the estate's motions to limit issues on appeal to those issues the record shows were presented to and considered by the trial court. Pursuant to that order, we do not consider Beverly's claim to statutory allowances under Minn. Stat. §§ 525.15, 525.151 (1988).

## ISSUES

1. Were the transfers to Beverly in lieu of a testamentary provision and solely from the nonmarital property of the decedent?

2. Was the antenuptial agreement sufficient as a matter of law to waive Beverly's legal rights as an omitted spouse under Minn.Stat. § 524.2–301?

3. Did the trial court err in finding the antenuptial agreement was presumptively valid as to marital property under Minn. Stat. § 519.11 (1988)?

## ANALYSIS

1. The trial court's factual findings will not be set aside unless clearly erroneous. *Peterson v. Johnston*, 254 N.W.2d 360, 362 (Minn.1977). This court may decide a question of law independently. *Driscoll v. Driscoll*, 414 N.W.2d 441, 445 (Minn.App. 1987).

Beverly argues she is an omitted spouse and Eldo did not transfer property in lieu of a testamentary provision because the property, in part, was hers. Minnesota has adopted the Uniform Probate Code. Under the Uniform Probate Code, a surviving spouse who marries the testator after the execution of the will and is not provided for by the will receives the same share of the estate as if the testator had left no will. Minn.Stat. § 524.2–301(a).

The purpose of the statute is to implement the testator's probable intent so as to avoid unintentional disinheritance and reduce elections against the will. Unif.Probate Code § 2–301 comment, 8 U.L.A. 87 (1990). Here, Beverly's intestate share would be the entire estate. *See* Minn.Stat. § 524.2–102(1) (1988).

There are, however, exceptions. The omitted spouse does not take an intestate share if

> it appears from the will that the omission was intentional or the testator provided for the spouse by transfer outside the will and the intent that the transfer is in lieu of a testamentary provision is shown.

Minn.Stat. § 524.2–301(a). The first exception does not apply. The will was executed before Eldo knew Beverly. Eldo could not have intended to omit her if he had not yet met her.

Beverly argues, however, that Eldo neglected to amend his will after their marriage. She also maintains he did not make transfers to her in lieu of a testamentary provision. She contends, therefore, that she is entitled to an omitted spouse's intestate share of the estate.

The estate argues Eldo reexamined the will and did not change it because his previous allocations provided for Beverly. Thus, the estate maintains, Eldo provided for Beverly by transfer outside the will in lieu of a testamentary provision.

We find both a transfer to Beverly and the intent that this transfer be a substitute for a testamentary provision. Section 2–301 of the Uniform Probate Code is a gap-filling rule as to the testator's intent. *See*

Comment, *The Un-omitted Spouse,* 52 U.Chi.L.Rev. 481, 483 (1985) (authored by Mary Ellen Kazimer). This means the focus is on whether the testator considered the relationship between his marriage and his old will. *Id.*

■ Beverly argues Eldo did not provide for her with "transfers in lieu of a testamentary provision," because large portions of the "transfers" were marital property in which she had an interest. The Uniform Probate Code, however, does not differentiate between marital and nonmarital property. These are family law concepts which do not apply under the Uniform Probate Code.

"Transfer" is not defined by the Uniform Probate Code. Other states have considered various factors in determining what is a "transfer in lieu of a testamentary provision." In *In re Estate of Frandson,* 356 N.W.2d 125 (N.D.1984), the length of marriage, the deceased spouse's retention of assets in her name alone and each spouse's contribution of assets were considered in determining whether the deceased intended a transfer in lieu of a testamentary provision. *Id.* at 127–28. The right of survivorship on certificates of deposit was considered a transfer. *Id.* at 128. Furthermore, the court said that

> a mere showing that the amount of benefits provided to a surviving spouse in the form of life insurance and joint tenancy properties exceeded one-third of the augmented estate did not warrant a conclusion, as a matter of law, that the decedent *intended* those benefits to be in lieu of a testamentary provision for the surviving spouse.

*Id.* at 127 (emphasis added).

■ After Eldo's death, Beverly had a right to approximately $280,000 in assets, pension plans, joint accounts or gifts over and above her own separate property. During their marriage, Eldo made Beverly the beneficiary of both his stock valued at $6,000 and his life insurance valued at $20,000. While the joint accounts were in both names, the source of the money was largely from Eldo's earnings.

We conclude that the joint accounts were transfers. The stock and insurance were Eldo's separately under the antenuptial agreement. They were in Eldo's name alone and from Eldo's property or income. We conclude they were also transfers.

■ Eldo's actions and the source of the income show that Eldo intended to transfer property to Beverly "in lieu of a testamentary provision." Most indicative is the life estate created by the following language in the antenuptial agreement.

> In the event of the death of [Eldo], * * * [Beverly] shall have a life estate interest for the full term of her natural life in and to all household goods owned by [Eldo] as well as the residence owned by [Eldo].

Eldo also made his will only one year before the antenuptial agreement. It is improbable that he would forget his will in such a short period of time. Eldo had a close relationship with his nieces and nephews and saw them often. The record shows he told his nieces and nephews that they were taken care of by a will. Beverly testified to the contrary. She testified that when they both went to see lawyers, Eldo was specifically asked if he had a will and replied he did not.

It is the trial court's role to assess the credibility of the witnesses and the weight of their testimony. The trial court correctly applied the law and its factual findings are not clearly erroneous. Eldo clearly intended for his will to remain in effect alongside the antenuptial agreement.

2. Beverly also argues the antenuptial agreement was insufficient as a matter of law to waive her right as an omitted spouse to take an intestate share. Because Beverly was provided for by a transfer outside the will in lieu of a testamentary provision, we do not reach this issue.

3. Finally, Beverly maintains the probate court failed to consider whether the antenuptial agreement was fair. Beverly does not dispute the agreement was procedurally fair. She asserts the trial court failed to consider substantive fairness. She also claims she did not understand the extent of the agreement.

■ An antenuptial agreement is a contract between two consenting adults who have the freedom to contract. Minn.Stat. § 519.11 (1988). Trial courts are to balance the freedom to contract of consenting, informed adults and substantive fairness. *McKee–Johnson v. Johnson*, 444 N.W.2d 259, 267 (Minn.1989). Where the language of a contract is plain and unambiguous, there is no need for construction. *Starr v. Starr*, 312 Minn. 561, 562–63, 251 N.W.2d 341, 342 (1977). The contract's meaning should be determined by its plainly expressed intent. *Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 298 Minn. 428, 433, 215 N.W.2d 473, 476 (1974).

Here, the contract clearly covers property acquired during the marriage. The relevant portion of the agreement reads:

> It is hereby agreed by and between the parties that it is their desire and intention that during said marriage each of them shall be and continue completely independent of the other as regards to the enjoyment and disposal of all property whether owned by either of them at the commencement of the marriage or coming to them or either of them during the marriage * * *.
>
> *     *     *     *     *     *
>
> The purpose and intent of this agreement is to fully, perfectly and completely define and limit the claims and demands that each of the parties to this contract shall have against the estate of the other should either party die during the pendency of this contract, or should the contract be determined by legal proceedings, the claims herein stipulated and defined shall be the limit which either party may have against the estate of the deceased party, or against each other in the event the marriage shall terminate by divorce or annulment or other statutory procedures.

■ Substantive fairness is decided on a case-by-case basis *McKee–Johnson*, 444 N.W.2d at 267. First, the court reviews the antenuptial agreement at its inception. *Id.* This scrutiny is of the relationship between the parties and the "potentiality for overreaching by one party over the other" because of the relationship. *Id.* Second, the agreement is scrutinized at the time of enforcement of the agreement to determine if the premises upon which the agreement was originally based

> have so drastically changed that enforcement would not comport with the reasonable expectations of the parties at the inception [so] that to validate them at the time of enforcement would be unconscionable.

*Id.*

■ At the antenuptial agreement's inception, Beverly and Eldo were clearly equal. They were close in age and had about the same amount of assets. Each had an attorney and each expressly consented to the agreement. This does not show overreaching by Eldo.

At the time of the enforcement of the antenuptial agreement, there had not been a drastic change. Throughout their eight years of marriage, the equal relationship continued. Beverly managed her own separate property and accounts, Eldo's finances and the home. Eldo earned an income driving a truck. Because Beverly managed Eldo's funds, the two were joint tenants on the accounts. There was very little co-mingling of assets, however. The income was Eldo's, except for one account which contained some of Beverly's rent proceeds and Eldo's income.

Applying the antenuptial agreement to the property and income obtained and earned during the marriage was substantively fair because it was expressly specified in the agreement. The trial court did not err in its determination that the antenuptial agreement was substantively fair.

## DECISION

The trial court did not err in finding that Eldo intended transfers to Beverly in lieu of a testamentary provision, and that the antenuptial agreement was enforceable as to the marital property.

Affirmed.