*This opinion is nonprecedential except as provided by
Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-1185**

In re the Estate of Margaret Peteler Bush,
a/k/a Margaret Bush, Deceased.

**Filed April 15, 2024
Affirmed in part, reversed in part, and remanded
Jesson, Judge\***

Ramsey County District Court
File No. 62-PR-21-304

Michael Kemp, Aaron Ferguson Law, Roseville, Minnesota; and

Nikki Bonine, Bonine Law Office, Roseville, Minnesota (for appellant David Bush)

Kay Nord Hunt, Michelle K. Kuhl, Lommen Abdo, P.A., Minneapolis, Minnesota (for respondent Greg Kummer)

Considered and decided by Smith, Tracy M., Presiding Judge; Bratvold, Judge; and Jesson, Judge.

**NONPRECEDENTIAL OPINION**

**JESSON**, Judge

A few weeks before appellant David Bush and Margaret Peteler Bush (Peg) were set to be married, Bush signed an antenuptial agreement at Peg's behest.[1] Almost 20 years later, Peg passed away. Her brother, David Peteler, subsequently petitioned for formal

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.
[1] For ease of reference, we use "Peg" to distinguish Peg Bush from appellant Bush.

adjudication of intestacy, determination of heirs, and appointment of personal representative. Bush objected to the petition and sought to void the antenuptial agreement.

After summary-judgment motions were filed, the district court determined that the antenuptial agreement was valid and enforceable because it was procedurally fair. Bush challenges that decision, arguing that the antenuptial agreement is not valid and enforceable because it is unfair both procedurally and substantively. We affirm the district court's determination that the antenuptial agreement is procedurally fair, but we reverse in part and remand because the district court failed to address substantive fairness, and issues of material fact preclude summary judgment on that issue.

## FACTS

Bush and Peg met in 2000. Bush was about 20 years older than Peg, had been divorced twice, and had four adult children from his previous marriages. He also served three years in the army and, after working 25 years as a machinist, earned science and art degrees from a community college. Bush then worked in a laboratory department, and later earned a deep tissue therapy degree. At the end of his career, Bush worked as a security guard.

Peg had "trouble with jobs." In the late 1980s, she sold cosmetics, and she worked as a medical technician in Iowa in the early 1990s. In 2000, Peg worked in the same laboratory as Bush, which is where they met. At the time the parties were married, Peg was not working, but after Peg married Bush, she worked at a company owned by a sibling's spouse. Peg did not work after 2010.

2

Peg had three siblings, Mark Peteler, David Peteler, and Melissa Peteler.[2] The four siblings were equal beneficiaries of three family trusts, the Hardy Kern Benefit Trust, the Edith Hardy Kern Trust, and the D.M. Hardy Trust. After the Hardy Kern Benefit Trust ended by its terms, it was rolled into a partnership, and later, in 1998, it was converted to the Hardy Kern LLC (the "LLC"). The Peteler siblings owned equal interests in the LLC, and their mother owned a smaller interest as well.

Due to the familial nature of the Peteler trusts, the Peteler siblings were expected to enter into antenuptial agreements with their spouses to ensure that "family money was passed down to family." Consequently, in mid-August 2002, a few weeks before Bush and Peg were to be wed, Peg informed Bush that her mother wanted them to have an antenuptial agreement because her mother did not want Bush to have an interest in the Peteler family assets. These assets included the LLC. Bush had no objection to such an agreement, and he and Peg signed the antenuptial agreement (the "agreement") on September 6, 2002.

The agreement contemplates the distribution of Bush's and Peg's assets upon dissolution of the marriage or the death of either Bush or Peg. Specifically, the agreement provides that, in the event of the death of either Bush or Peg, the surviving spouse would have no right to the nonmarital property of the deceased spouse except as authorized by the agreement, or as the deceased spouse may choose in their last will and testament. The agreement also contains exhibits detailing the property and assets of Peg and Bush. Exhibit A to the agreement, which lists Peg's property and assets, states that Peg is a "Trust

---

[2] For ease of reference, the Peg and her siblings will be referred to by first name.

3

Beneficiary" who "receives approximately $6,000.00 to $7,500.00 quarterly from Hardy Kern LLC." Exhibit A does not state the principal value of the LLC. Nor does Exhibit A list Peg as a beneficiary of either the Edith Hardy Kern Trust or the D.M. Hardy Trust. But tax returns from 2001 were attached to the agreement, which reference income from both of these trusts.

Peg and Bush were married on September 21, 2002, in Stillwater. Approximately 150 guests attended the wedding, which involved Peg and her bridesmaids being floated down the St. Croix River on a gondola before the ceremony. Although Bush "would have been perfectly happy with a justice of the peace," Peg planned and paid for the entire wedding.

In March 2019, almost 17 years after they were married, Peg had a "premonition" that she would die. About this time, she added Bush's name to four bank accounts and IRAs that she had previously kept separate.[3] She also, allegedly, handwrote several notes purportedly detailing her last wishes. The notes are neither witnessed nor notarized.

Later in 2019, the LLC was dissolved, and Peg received a distribution from the LLC of approximately $550,000. But in September 2020, after receiving her distribution, Peg passed away. She died without a will.

In March 2021, David filed a petition for formal adjudication of intestacy, determination of heirs, and appointment of personal representative. Bush subsequently filed an objection to David's petition, and amended petition to void antenuptial agreement,

---

[3] The amount of these accounts is not reflected in the record.

4

to impose constructive trust, and for determination of heirs. David was then appointed personal representative of Peg's estate and was later succeeded as personal representative by respondent Greg Kummer of Trinity Fiduciary Services.

Kummer moved for summary judgment, arguing that the agreement was valid and enforceable. Bush filed a cross-motion for summary judgment, contending that the agreement was not valid because, as a matter of law, it was procedurally unfair. Bush also asserted that issues of material fact precluded summary judgment in favor of Kummer on the issue of the agreement's substantive fairness.

The district court denied Bush's motion for summary judgment and granted Kummer's motion for same. In granting Kummer's motion, the district court determined that the agreement was valid and enforceable because it was procedurally fair. The district court, however, did not address the agreement's substantive fairness. This appeal follows.

**DECISION**

Bush challenges the district court's decision granting summary judgment in favor of Kummer. Summary judgment is appropriate when there are no genuine issues of material fact, and a party is entitled to judgment as a matter of law. *Warren v. Dinter*, 926 N.W.2d 370, 374 (Minn. 2019). We review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party, and resolving all doubts and factual inferences against the moving party. *Fenrich v. The Blake School*, 920 N.W.2d 195, 201 (Minn. 2018).

We begin our de novo review acknowledging that antenuptial agreements are contracts recognized and favored at common law. *Pollock-Halvarson v. McGurie*, 576

5

N.W.2d 451, 455 (Minn. App. 1998), *rev. denied* (Minn. May 28, 1998). Minnesota has "long recognized" the validity of antenuptial agreements, which can govern property settlements upon dissolution and disposition of parties' estates upon death. *Hill v. Hill*, 356 N.W.2d 49, 53 (Minn. App. 1984), *rev. denied* (Minn. Feb. 19, 1985). When examining that validity, we begin with the supreme court's directive that "[a]ntenuptial agreements must be fair, both procedurally and substantively." *Kremer v. Kremer*, 912 N.W.2d 617, 621 (Minn. 2018). Bush argues that the agreement fails on both fronts. As a result, he contends, the district court erred in granting summary judgment. We address these issues related to procedural and substantive fairness in turn.

## I. The district court appropriately determined that the agreement was procedurally fair.

Procedural fairness is governed by Minnesota Statutes section 519.11 (2022),[4] and, in some circumstances, common law. *Id.* at 622. Here, we begin with the statute, which, in subdivision 1, provides that an antenuptial contract "shall be valid and enforceable if (a) there is a *full and fair disclosure* of the earnings and property of each party, and (b) the parties have had *an opportunity to consult with legal counsel* of their own choice." Minn. Stat. § 519.11, subd. 1 (emphasis added). The statute goes on to state that an antenuptial agreement "made in conformity with this section may determine what rights each party has in the nonmarital property . . . upon dissolution of marriage, legal separation or after its termination by death and may bar each other of all rights in the respective estates

---

[4] Section 519.11 applies to all antenuptial agreements executed on or after August 1, 1979. Minn. Stat. § 519.11, subd. 6.

not so secured to them by their agreement." *Id.* But the statute further provides "[t]his section shall not be construed to make invalid or unenforceable any antenuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if the agreement or settlement would be valid and enforceable without regard to this section." *Id.*[5]

For interpretation of this statute, we turn to *Kremer*, where the Minnesota Supreme Court interpreted subdivision 1 as providing "safe harbor" for provisions of antenuptial agreements that distribute nonmarital property. *Kremer*, 912 N.W.2d at 624 ("By its plain language, subdivision 1 of section 519.11 limits the reach of the statutory procedural-fairness standard to provisions of antenuptial agreements addressing nonmarital property."). In other words, if an antenuptial agreement satisfies subdivision 1 (that is, there was full and fair disclosure and an opportunity to consult counsel), then the agreement's distribution of *nonmarital* property is procedurally fair. *Id.* If an antenuptial agreement does not satisfy subdivision 1, then the question of whether the agreement is procedurally fair must be answered by common law. *Id.* And the common-law standard applies to provisions of an antenuptial agreement that address (1) marital property and (2) marital and nonmarital property. *Id.* at 626.

The parties here agree, as did the district court, that the vast majority of the provisions in the agreement address nonmarital property. As such, we apply the statutory

---

[5] Section 519.11 also requires that an antenuptial agreement "be in writing, executed in the presence of two witnesses and acknowledged by the parties" at least one day before the marriage takes place. Minn. Stat. § 519.11, subd. 2. There is no dispute that the agreement satisfies these requirements.

safe harbor contained in section 519.11, subdivision 1, to the provisions of the agreement related to nonmarital property.

### A. The agreement is procedurally fair under the statutory safe-harbor provision.

Under the statute, the agreement "shall be valid" if it satisfies the following two conditions: (1) "there is a full and fair disclosure of the earnings and property of each party"; and (2) "the parties have had an opportunity to consult with legal counsel of their own choice." Minn. Stat. § 519.11, subd. 1. Bush does not dispute that he had the opportunity to consult with legal counsel of his choice. Indeed, the record reflects that he had such an opportunity. But Bush argues that there was no full and fair disclosure of Peg's assets.

"[N]o particular form of disclosure" is contained in section 519.11, subdivision 1. *Pollock-Halvarson*, 576 N.W.2d at 456. And "full" disclosure does not mean "literally every item of tangible or intangible property that a party has an ownership interest in" because "[s]uch an interpretation would impose on contracting parties an intolerable burden and would foster the defeasibility of the contract for the most trivial omission." *Id.* Instead, if there has been less than a perfect disclosure, we "must look to the nature and circumstances of the deficiency to determine the significance of the omission." *Id.* at 457.

Here, Bush claims that, although the agreement listed Peg as a trust beneficiary with $6,000 to $7,500 quarterly distributions from the LLC, it failed to disclose that she was "[i]n fact . . . a *member* of [the LLC] with a 21.78% ownership stake" amounting to approximately $500,000. Bush also asserts that Peg failed to disclose the value of her

interest in the Hardy Kern Trust and the D.M. Hardy Trust, which amounted to approximately $175,000 in further undisclosed assets. Finally, Bush contends that Peg's failure to disclose her ownership interest in the three trusts, valued at approximately $675,000, is "not a 'trivial' omission." As a result, there was not full and fair disclosure of Peg's assets.

We disagree. Although the agreement states that Peg is a "trust beneficiary" of the LLC, the agreement clearly states that the entity is a limited liability company. The agreement also states that Peg "receives approximately $6,000 to $7,500 quarterly," as well as "[o]ther distributions made at trustee's discretion." Bush testified that he learned about the LLC "[i]mmediately after [he] got with" Peg, that he understood that the company was a "family business" related to commercial property, that Peg was "[a]n equal member" of the LLC, and that she would eventually get "her share" of the LLC when it was dissolved. Bush's testimony indicates that, before entering into the agreement, he knew that Peg had an ownership interest in the LLC, which presumably had some value.

Also, despite not listing the Hardy Kern Trust and the D.M. Hardy Trust in Exhibit A to the agreement, Peg attached her 2001 tax return to the agreement. The tax return lists the Hardy Kern and the D.M. Hardy trusts, and the income she received from these trusts in 2001. And Exhibit A to the agreement fully discloses Peg's other personal property and assets, which, when combined with the trusts at issue, demonstrate that Bush knew Peg's financial circumstances, and that she had substantially more assets and income than he had.

Moreover, this court has held that a party's general knowledge of the other's financial condition, coupled with the willingness to enter into an agreement, can be

9

sufficient to satisfy the disclosure requirement. *Hill*, 356 N.W.2d at 52-54 (acknowledging that wife was willing to sign the antenuptial agreement "whether he had two million dollars or two hundred dollars"). And we held that a woman living with a man for six years before the marriage who was familiar with the home and the possessions within it, coupled with the woman's statement that she trusted him and would sign anything he wanted, was sufficient to satisfy the disclosure requirement. *Pollock-Halverson*, 576 N.W.2d at 456.

With this precedent in mind, we turn to the record here. It establishes that Bush and Peg lived together before they were married. Bush also testified that he was going to marry Peg regardless of the amount her estate. And the record reflects that, when asked if he had any objection to the antenuptial agreement, Bush stated, "I wasn't going to slow the process down. My wife wanted to be married, so we'll be married." Bush further testified that he knew that Peg's mother wanted the antenuptial agreement "to protect her children," which Bush stated that he had "no problem with." In sum, Bush's general knowledge of Peg's financial circumstances, along with his testimony that he would have married Peg regardless of the amount of her estate, supports the conclusion that there was full and fair disclosure. *See Hill*, 356 N.W.2d at 52-54 (holding that a party's general knowledge of the other's financial condition coupled with the willingness to enter an agreement no matter what assets existed can be sufficient to satisfy the disclosure requirement). This knowledge, in addition to the financial disclosures in Exhibit A to the agreement, leads us to conclude that the agreement is procedurally fair as to the nonmarital assets under the safe harbor provision contained in section 519.11, subdivision 1.

### B. The agreement is procedurally fair under the common-law *Kinney* factors.

Because there are provisions in the agreement related to marital property,[6] we also address whether the agreement is procedurally fair under the common-law factors set forth in *In re Estate of Kinney*, 733 N.W.2d 118, 124 (Minn. 2007). These factors are whether (1) "there was fair and full disclosure of the parties' assets"; (2) "the agreement was supported by adequate consideration"; (3) "both parties had knowledge of the material particulars of the agreement and of how those provisions impacted the parties' rights in the absence of the agreement"; and (4) "the agreement was procured by an abuse of fiduciary relations, undue influence, or duress." *Kinney*, 733 N.W.2d at 124; *see also Kremer*, 912 N.W.2d at 626 (upholding this multi-factor test). Appellate courts also consider whether the parties had an opportunity to consult with independent counsel, although such an opportunity is not required for an antenuptial agreement to be valid under common law. *Kinney*, 733 N.W.2d at 124; *see Kremer*, 912 N.W.2d at 625-26.

#### 1. Full and fair disclosure

Bush argues that there was no full and fair disclosure of Peg's assets. But as we concluded above, there was full and fair disclosure of Peg's assets.

#### 2. Consideration

Next, Bush argues that the agreement was not supported by adequate consideration. We disagree. In addressing this issue, we "examine the circumstances surrounding the execution and enforcement" of the agreement to determine whether they are fair and

---

[6] For example, the agreement provides that "[a]ny Marital Property shall be divided between the surviving [spouse] and the estate of the deceased [spouse] in equal shares."

11

equitable. *Kremer*, 912 N.W.2d at 627. In *Kremer*, the supreme court concluded that the parties' antenuptial agreement was not supported by adequate consideration because (1) the husband entered the marriage with "significant assets" while the wife had "very little"; and (2) the wife "would leave the marriage with very little" if the agreement were enforced, despite her contributions to the husband's farming operation, her maintenance of the household, and her care for the couple's child during the marriage. *Id.* at 628.

Here, unlike in *Kremer*, where the wife contributed to the farming operation, and cared for the couple's children, Bush and Peg had no children together. Nor did Bush contribute to the success of Peg's family operations and assets. This is also not a situation where Bush would be left penniless upon his wife's death. *But see Slingerland v. Slingerland*, 132 N.W. 326, 328 (Minn. 1911) (determining that consideration was "pitifully inadequate" where husband and wife had been married 20 years, had four living children at the time of husband's death, and enforcing the agreement would leave the wife "penniless"). Indeed, Bush's counsel acknowledged at oral argument that Bush would not be "impoverished" by enforcement of the agreement. Rather, the district court determined, and the record supports, that appellant was self-sufficient, provided for himself throughout his life, and benefited financially by being married to Peg from, among other things, the transfer on death bank accounts.

Moreover, the agreement states that Bush and Peg "are aware of each of their commitments to their own family, children and grandchildren and other personal obligations and desire to resolve in advance the disposition of their respective property and assets to allow flexibility to each other in their own personal financial planning." The fact

12

that both Bush and Peg agreed to give up certain rights in exchange for the other doing the same supports a conclusion that the agreement was supported by consideration. *See Concordia Coll. Corp. v. Salvation Army*, 470 N.W.2d 542, 546 (Minn. App. 1991) ("Where promises are mutual, made concurrently, and incorporated into a bilateral contract, such promises are sufficient consideration for each other."), *rev. denied* (Minn. Aug. 2, 1991). And the agreement expressly states that Bush and Peg "agree that this Agreement is fair and equitable, is made in consideration of marriage and the property settlement contained in the Agreement." Accordingly, in light of the circumstances surrounding the execution and enforcement of the agreement, we conclude that the agreement was supported by adequate consideration.

### 3.   *Material particulars of the agreement*

Bush argues that the "undisputed facts show that [he] could not and did not have knowledge of the material particulars of the [a]greement nor had knowledge of how the provisions of the [a]greement impacted his rights." We are not persuaded. In *In re Est. of Jeurissen*, the supreme court held that, in spite of the wife's evidence that she did not fully understand the effect of the antenuptial agreement, the agreement was valid because the wife was "a reasonably intelligent and experienced person even though her formal education was not extensive" and because "she probably recognized and respected a disposition on the part of her husband, 67 at the time of the marriage, to preserve the bulk of his estate for [his children]." 161 N.W.2d 324, 326 (Minn. 1968). And in *Hafner v. Hafner*, the supreme court upheld the validity of an antenuptial agreement where, "although [the wife] was not told of her rights in the absence of an antenuptial contract,

13

she was aware of, and freely and voluntarily acceded to, [the husband's] desire to leave his property to his children," and the wife "was a reasonably intelligent and experienced individual, even though she ha[d] a limited formal education." 295 N.W.2d 567, 571-72 (Minn. 1980).

Here, Bush fails to identify any specific part of the agreement or any statutory right that he did not understand. And the agreement unambiguously states that he is not entitled to any of Peg's nonmarital property. Although Bush claimed that the agreement is like "a foreign language," he testified that Peg's mother wanted him to sign the agreement because she did "not want [him] to have access in any manner to the LLC." Bush also acknowledged that the agreement was "[v]ery fair" at the time he signed it, and that he had "no problem" signing it. This testimony indicates that Bush understood the particulars of the agreement, and that by signing it, he would have no interest in the LLC.

Moreover, the record reflects that Bush is a reasonably intelligent, experienced individual. At the time he signed the agreement, Bush was 60 years old and had science and art degrees from a community college, as well as a deep tissue degree from a massage school. He also had been divorced twice, indicating a general understanding of marital rights. And Bush spent three years in the army and had an extensive employment history, demonstrating that he was a very experienced individual. As such, this factor weighs in favor of upholding the agreement's validity.

### 4. *Abuse of fiduciary relations, undue influence, or duress*

Duress is coercion through threats or other circumstances that abolish the victim's free will and compel him or her to comply with some demand of the party exerting the

14

coercion. *Kremer*, 912 N.W.2d at 628. The test does not concern the nature of the threats, but whether the victim really had a choice. *Id.* In assessing this factor, appellate courts consider the circumstances surrounding the execution of the antenuptial agreement to determine whether the disadvantaged spouse "acted of her own free will, or whether her free will was overcome by" the advantaged spouse. *See id.*

Here, the record reflects that Peg asked Bush to sign the agreement several weeks before the wedding. There is no indication in the record that Peg threatened to call off the wedding if Bush did not sign the agreement. Nor is there any indication that Peg coerced Bush to sign the agreement in any other way. Instead, Bush acknowledges that he had no objection to the agreement and testified, "I wasn't going to slow the process down. My wife wanted to be married, so we'll be married." Consequently, there is no indication of duress or undue influence.[7]

In sum, our review of the common-law *Kinney* factors indicates that the agreement was fairly and equitably made. Accordingly, the district court did not err in concluding that the agreement was procedurally fair both under the statutory safe harbor, and pursuant to the *Kinney* factors.

II.     **Issues of material fact related to substantive fairness of the agreement at time for enforcement preclude summary judgment.**

Bush also challenges the substantive fairness of the agreement. Antenuptial agreements must be substantively fair at the time of execution and enforcement. *See*

---

[7] Although not required for an antenuptial agreement to be valid under common law, we note that, as addressed above, Bush had the opportunity to consult with independent counsel before he and Peg executed the agreement. *See Kinney*, 733 N.W.2d at 122, 124.

*McKee-Johnson v. Johnson*, 444 N.W.2d 259, 267 (Minn. 1989), *overruled on other grounds by Kremer*, 912 N.W.2d at 626, *and Kinney*, 733 N.W.2d at 125.[8] "Substantive fairness guards against misrepresentation, overreaching, and unconscionability." *Pollock-Halvarson*, 576 N.W.2d at 455. When evaluating substantive fairness at the time of execution, we consider whether the circumstances at the time of execution show a "potentiality for overreaching by one party over the other due to the relationship existing between them." *McKee-Johnson*, 444 N.W.2d at 267. And, when evaluating substantive fairness at the time of enforcement, we consider whether a change in the parties' circumstances after execution would render enforcement of the agreement "oppressive and unconscionable." *Id.* In considering the substantive fairness of an antenuptial agreement, courts must "balance the freedom to contract of consenting, informed adults and substantive fairness." *See In re Est. of Aspenson*, 470 N.W.2d 692, 696 (Minn. App. 1991).

Here, the district court did not address the substantive fairness of the agreement. Bush cites this failure as reversable error, while Kummer argues that, because the agreement meets the statutory safe harbor, it is unnecessary to consider substantive fairness. Below, we first address whether an antenuptial agreement that meets the statutory

---

[8] The supreme court in *Kremer* "overruled" *McKee-Johnson* "to the extent that it determined that the common-law statutory procedural tests were 'substantially identical'" because "[t]hey are not." 912 N.W.2d at 626. And in *Kinney*, the supreme court held that the "opportunity to consult with independent counsel is not a requirement but is one of several relevant factors that courts may consider when determining whether an antenuptial agreement is fair and equitable and therefore enforceable under common law," and that, to the extent that *McKee-Johnson* could be read to indicate otherwise, it is "overruled on that issue." 733 N.W.2d at 125-26. But there is no indication in *Kremer* or *Kinney* that the supreme court overruled the analysis in *McKee-Johnson* related to substantive fairness.

safe harbor must also be substantively fair. After answering this question in the affirmative, we turn to whether Bush raised factual disputes as to substantive fairness that preclude summary judgment.

Reading the first sentence of section 519.11, subdivision 1, in isolation appears to support Kummer's position. It states that two spouses may agree to "an antenuptial contract . . . prior to solemnization of marriage which *shall be valid and enforceable* if" the statutory prerequisites are met. Minn. Stat. § 519.11, subd. 1 (emphasis added). The legislature's use of the word "shall" would typically indicate that, as long as an antenuptial agreement meets the statutory requirements, the agreement must be enforceable. *See* Minn. Stat. § 645.44, subd. 16 (2022) ("'Shall' is mandatory.").

But we review the statute's scope in light of supreme court precedent. And that precedent states that antenuptial agreements must be both procedurally and substantively fair. *Kremer*, 912 N.W.2d at 621. In *Kremer*, the husband sought a determination that the parties' antenuptial agreement was "procedurally and substantively fair, and therefore valid and enforceable." *Id.* In deciding this issue, the first sentence of the supreme court's analysis states that "[a]ntenuptial agreements must be fair, *both procedurally and substantively.*" *Id.* (emphasis added). And the supreme court later noted that "section 519.11 addresses only procedural fairness, and that antenuptial agreements must also be substantively fair under the common law." *Id.* at 622 n.3.

Still, Kummer points to language in *Kremer* where the supreme court states that "once the statute's two basic conditions are met, provisions of agreements addressing nonmarital property are automatically valid" to support the position that satisfying the safe

harbor makes substantive fairness review unnecessary. *See id.* at 624. But we read this sentence in context. That context includes the preceding sentence, which explicitly describes the plain language of Minnesota Statutes section 519.11, subdivision 1, as a "procedural fairness 'safe harbor'" for provisions purporting to distribute nonmarital property.[9]

Moreover, caselaw prior to *Kremer* acknowledges that the validity of antenuptial agreements rests upon both procedural and substantive fairness. For example, in *McKee-Johnson*, the supreme court recognized that, by enacting section 519.11, the "legislature attempted to codify *procedural* requirements." 444 N.W.2d at 263 (emphasis added). But the supreme court then stated that a "fairness analysis" related to antenuptial agreements "requires a review of *both* procedural and substantive fairness of the contract." *Id.* at 265 (emphasis added); *see Pollock-Halvarson*, 576 N.W.2d at 455 (acknowledging that "at common law, a statutorily valid antenuptial agreement must satisfy the requirements of procedural and substantive fairness"). And after *Kremer* was decided, this court cited

---

[9] We note that, in a previous paragraph, the supreme court addressed the plain language of section 519.11, subdivision 1, recognizing that "if parties to . . . antenuptial agreement satisfy both [statutory] conditions, th[e] agreement would be automatically valid." *Kremer*, 912 N.W.2d at 624. Here again, we read the "automatically valid" phrase to be a reference to the "shall be valid and enforceable" language contained in the statute, meaning that, if an antenuptial agreement satisfies the statutory safe harbor, we need not examine the common-law *Kinney* factors, which relate only to the procedural fairness of the agreement. *See* Minn. Stat. § 519.11, subd. 1 (stating that parties "of legal age may enter into an antenuptial contract or settlement prior to solemnization of marriage which *shall be valid and enforceable* if" certain conditions are satisfied (emphasis added)). Use of the "automatically valid" phrase does not negate the clear statement that begins the supreme court's analysis: "Antenuptial agreements must be fair, both procedurally and substantively." *Kremer*, 912 N.W.2d at 621.

*Kremer* in recognizing that "[a]ntenuptial agreements must be fair, both procedurally and substantively. The common law governs the standard for substantive fairness. The procedural fairness of antenuptial agreements is governed by both common-law and statutory standards." *Muschik v. Conner-Muschik*, 920 N.W.2d 215, 221 (Minn. App. 2018) (quotations and citations omitted). In sum, we conclude that the district court erred by failing to address the substantive fairness of the agreement.[10]

While substantive fairness is decided on a case-by-case basis, *McKee-Johnson*, 444 N.W.2d at 267; *see Aspenson*, 470 N.W.2d at 696 ("Substantive fairness is decided on a case-by-case basis."), given the summary-judgment context here, we necessarily turn to whether Bush raised material disputed facts as to substantive fairness at the time of either execution or enforcement. In addressing substantive fairness, the supreme court in *McKee-Johnson* stated district courts should review the substantive fairness of antenuptial agreements "in light of the circumstances existing at the inception," which "will require appropriate inquiry into facts bearing upon the reasonable expectations of each signatory as to the scope and ultimate effect of the contract in the event the marriage should [be] terminated by dissolution." 444 N.W.2d at 267. The supreme court also stated that courts should review and make appropriate findings related to any sequences of events that "significantly resulted in changed circumstances so as to trigger a further substantive

---

[10] Bush cites Minn. Stat. § 519.11, subd. 1a, to support his position that the district court erred by not addressing substantive fairness. But that statute relates to postnuptial contracts. *See* Minn. Stat. § 519.11, subd. 1a (addressing postnuptial contracts). As such, section 519.11, subdivision 1a, is not relevant to the issue of whether a substantive-fairness analysis must be conducted in determining the validity of an antenuptial contract.

fairness review; or, to state it another way, whether in light of those facts the enforcement would be oppressive and unconscionable." *Id.*

Here, although we do not see any material facts in dispute related to the time of the agreement's execution, we agree with Bush that there are issues of material fact related to the substantive fairness of the agreement at the time of its enforcement. For example, the agreement reflects that Bush and Peg's marital home was Peg's nonmarital asset. But Bush testified that he paid the townhome's association fees and purchased a $6,500 furnace and a $1,200 refrigerator for the townhome. He also paid to have the townhome repainted and paid approximately $2,500 for new "Pergo flooring." Bush further claimed that he fixed "simple things" in the townhome and engaged in miscellaneous maintenance of the townhome, such as removing maple trees and "digging up th[e] damn stump." And Bush testified that Peg always filed their taxes jointly, and that he paid for some of Peg's individual expenses, such as her health insurance and phone bill. Bush's contributions to the townhome—Peg's nonmarital asset—as well as indications that Bush and Peg may have comingled their assets, create an issue of fact as to whether enforcement of the agreement would be oppressive and unconscionable.

Moreover, the record reflects that Peg was approximately 20 years younger than Bush, and Peg's sister-in-law testified that Peg anticipated outliving Bush. Bush also testified that it was his "agreement" with Peg that he "would work until she got her share" of the LLC. But according to Bush, Peg told him about six months before she died, "'[I]f I need hospitalization, these accounts will be available to you to maintain the house.'" And Bush acknowledged that, in March 2019, he "became a joint owner on four different

20

accounts that had previously been held in the name of Peg individually." Peg's actions related to adding Bush to her bank accounts, when viewed in the light most favorable to Bush, demonstrate that there are issues of material fact related to whether there were changed circumstances that impacted Peg and Bush's desire to follow the agreement. The potential of changed circumstances are further reflected by the notes Peg handwrote in 2019. Accordingly, we conclude that the circumstances that may have changed over the course of Peg and Bush's marriage, when viewed in the light most favorable to Bush, create issues of fact related to the substantive fairness of the agreement at the time of enforcement.

Because there are issues of material fact related to the substantive fairness of the agreement, summary judgment at this stage in the proceedings was improper. We therefore reverse and remand for consideration of the substantive fairness of the agreement at the time of enforcement. We acknowledge, as did the supreme court in *McKee-Johnson*, that district courts engaging in substantive-fairness consideration must strike a balance between the law's policy favoring freedom of contract between informed consenting adults and substantive fairness, which is a difficult task. *See* 444 N.W.2d at 267-68. But with this task in mind, the district court on remand should consider whether a change in the parties' circumstances would render enforcement of the agreement "oppressive and unconscionable." *See id.* at 267.

**Affirmed in part, reversed in part, and remanded.**

21